## F. P. MILLER v. THE STATE.

*No. 91. Decided January 21. Motion for rehearing overruled June 24.*

1. **Jury—Qualification of Special Venireman—Conclusion as to Guilt.**—In ascertaining the qualifications on voir dire examination of a proposed juror, when the juror states that he has formed a conclusion as to the guilt of the defendant, the important questions are, "was this a fixed and settled conclusion?" and "was his opinion so entertained as to become a fixed belief of the guilt of the accused?" If these questions are affirmatively answered, then he is incompetent and disqualified.

2. **Same—Practice on Appeal.**—On appeal, in order to have reversed the ruling of the trial court holding a juror competent who has formed a conclusion, the record must show the source of the juror's information; that is, whether he witnessed the transaction, was informed of the facts, talked with the witnesses, had read the evidence, or whether his opinion was founded on vague rumors.

3. **Continuance—Reputation of Accused.**—A continuance will not be granted for witnesses to prove the good reputation of the accused. This is no ground for a continuance.

4. **Same—Requisites of Application—Threats.**—An application for continuance for witnesses to prove threats against defendant is wholly indefinite and insufficient as to particularity and specification, which fails to give the

names of the parties making the threats, the time when the threats were made, and if communicated to defendant, the name of his informants.

**5. Same—Continuance—Mob Violence.**—When matters pertaining to the acts and conduct of a mob in attempting to hang defendant at the time of his arrest are included in and made a part of the application for continuance, *held*, that such matter is not ground for continuance, but for a change of venue, and will not be considered in connection with and as a part of the application for continuance on appeal, where it appears that the mob violence complained of occurred more than a month prior to the trial. and there was no attempt to show any improper conduct, either by word or act, from any source at the time of the trial.

**6. Murder—Evidence as to Previous Acts, Conduct, and Declations of Defendant.**—On a trial for murder of a policeman, where it appeared that on the day preceding the homicide defendant was on the public streets unlawfully carrying a pistol. and threatening to kill any damned policeman who should attempt to arrest him, which conduct and threats were communicated to the deceased and another policeman, and in their effort to arrest the defendant the next day, without a warrant, for unlawfully carrying the pistol, the deceased was shot and killed by defendant; and it was objected that evidence as to the purpose of the policemen to arrest the defendant without a warrant for carrying a pistol and raising a disturbance, upon communication made them after completion of the offense, and their conversation between themselves and with others as to defendant's dangerous character, and the method of securing his arrest, was hearsay, irrelevant, and incompetent: *Held*, that the evidence was clearly competent, and made so by the acts and threats of defendant.

**7. Charge of the Court.**—See charge of court upon a trial for murder of a policeman in his efforts to arrest defendant, without a warrant, for unlawfully carrying a pistol, *held*, to be an admirable application of the law to every feature of the case.

**8. Unlawfully Carrying a Pistol — Arrest without Warrant — Credible Person.**—On a trial for murder of a policeman, while endeavoring upon information of others and without a warrant to arrest defendant for unlawfully carrying a pistol, *held*, that under article 322, Penal Code, it is not essential that the offense is being committed at the time the officer is informed thereof; and *held*, further, in the absence of proof to the contrary, the law presumes a citizen to be a credible person.

**9. Homicide in Resisting Illegal Arrest — Murder of First Degree, when.**—A homicide in resistance to an illegal arrest of an ordinary character, while not justifiable, may reduce the offense to manslaughter. But while this is the general rule, yet the killing may be done under such circumstances of deliberation or cruelty as will afford proof of express malice, and murder of the first degree, as when done with a weapon deliberately prepared beforehand to resist the illegal arrest.

**10. Arrest Without Warrant Legal, when.**—By provision of article 322, Penal Code, any peace officer is expressly authorized to arrest without warrant a party unlawfully carrying arms, and he is liable to punishment if he refuse to do so, on his own knowledge or upon information from some credible person.

**11. Same—Unnecessary Violence — Apprehensions of Danger.**—When an officer, in attempting an arrest, does so in a wanton, violent, and unreasonable manner, such as reasonably created in the mind of the party he was seeking to arrest apprehension of death or serious bodily harm, and acting upon such apprehension the party kills the officer, the killing would be either justifi-

able, or of no higher grade of culpable homicide than manslaughter. But when defendant, by his own acts and conduct, causes the officer, in fear of his life, to prepare himself with arms ready for immediate use, to prevent the execution of his (defendant's) deadly threats, *held*, defendant can not be heard to complain of serious apprehension to life or body.

12. **Murder—Previous Malice—Fresh Provocation.**—On a trial for murder, where a fresh provocation has intervened between the original trouble and the homicide, it is correct as a proposition of law that the killing should be attributed to the fresh provocation, and not to the previous malice; but this rule has no application where one, knowing he has violated the law, and will be arrested therefor, determines to make the issue one of *life* and *death*, coolly and deliberately prepares himself for that issue, and when the crisis comes takes the initiative without provocation, and kills the party whose life he has previously threatened.

13. **Murder of the First Degree.**—See evidence which, in the opinion of the court, is amply sufficient to support a judgment of conviction for murder of the first degree, with the death penalty.

APPEAL from the District Court of Dallas. Tried below before Hon. CHARLES FRED TUCKER.

Appellant was tried upon an indictment charging him with the murder of one W. H. Riddle, and at the trial was found guilty of murder in the first degree, his punishment being assessed at death.

The appeal came on for hearing at the Dallas Term, and the judgment was affirmed in the opinion below, delivered by Presiding Judge HURT on the 21st of January. The motion for rehearing was taken under advisement, and transferred to the Austin branch, where the same was overruled without a written opinion, on the 24th day of June.

In several important particulars there is much similarity between this case and the case of Henry Miller v. The State, 31 Texas Criminal Reports, 609, and the opinion in this latter case cites the opinion in this case several times as the same was reported in 20 Southwestern Reporter, 1103.

Defendant made a motion for continuance, predicated partly upon both the statutory grounds for change of venue, an application for which defendant claimed he was unable to make because he could not procure the necessary compurgators on account of the prejudice against him; and he prayed the court to continue the case in order that the prejudice might abate, or, in the alternative, that the court would of its own motion change the venue.

In regard to this matter he alleged the assaults made upon him by a mob and their efforts to hang him.

The defendant sought the continuance on the further ground of the absence of Mrs. Kirkham and E. A. Kirkham, who resided in the same building with the defendant, and by whom he expected to prove his reputation as a quiet and peaceable citizen, and that he had been informed prior to the homicide that the police would kill him, and that he had ex-

pressed his apprehension and fear thereat to said witnesses, and requested them to awake him should they hear parties in the house at night, and that for the purpose of protection defendant had armed himself. Diligence to secure the attendance of said witnesses is conceded. The court overruled the defendant's application for continuance and change of venue embodied therein.

Tom Early, for the State, testified: On the 17th of June last I was a police officer in the city of Dallas. I don't think I ever saw F. P. Miller to know him until I saw him here the other morning. I assisted in trying to arrest him. We started up there to arrest him on the 16th of June. We wanted to arrest him for carrying a pistol out on the street on the 16th. After supper we heard of him carrying a pistol; a man by the name of D. L. Wilson, a night watchman at the street car stables, told us about it. He told W. H. Riddle and me, and we started out after supper, and we got as far as Conarty's saloon, and we asked Conarty if he had seen Miller carrying a pistol. We looked over at Miller's shop and saw that everything was dark, and Conarty told us that we had better not go over there at night. He said we had better make the arrest in the daytime, as Miller was a bad man, and we did not want to have a difficulty with him. When we went to arrest him the next day, I said to Riddle that we had better have our pistols out, as this man might be a dangerous man. He said, "All right." We had no other information at that time as to Miller being a dangerous man except what Wilson told us. The next morning, as I said, we went back there to arrest him when we reported for duty. We reported on duty a little after 10 o'clock, and we went right straight up there, going by Duncan's corner, and crossed over the street car track and went over to Elm Street, and came down Elm Street on the north side, and stopped in the barber shop up there. Wilson had told us something about this barber. We arrested him on the information furnished us. We wanted to get still more testimony, and we went into that barber shop and asked the negro in there if he had seen Miller in there. He said, " No, sir; I never saw no man here at all." I think the negro's name was Anderson. He said, "I don't know anything about that man; I don't want to be mixed up in anything of that kind." I told Riddle that we could get no information there, and to let us go back to George Miller's saloon, and we went up there. Riddle talked to George Miller, but I was on the outside and do not know what they said, but Riddle came towards me and said, "All right, Tom, we will go and get him." We then started down towards defendant's house to get him, and I told Riddle that we had better have our pistols out. I took out my pistol, and he took out his club.

When we got there we went along the wall in front of his house, and walked right up close to the wall, and I had my pistol in my left hand, as I am a left-handed man. Just as I stepped up in his doorway the de-

fendant looked up.  He was sitting in a low chair right in front of the door.  He was sitting in his work chair, but I could see the motions of his hands easy, and just as he saw who we were he made a dive down, right this way (grabbing his hands right down by his side), and grabbed his pistol, and just as soon as I saw him do that, I raised my pistol and pulled the trigger, but it only cocked about half way and would not fire, and the next instant there was a flash in my face and it staggered me.  That is, I do not know what staggered me, but I suppose it was the concussion. I came sorter back this way (the witness here swayed his body backward in his seat), and I was blinded, and I made one or two steps and fell off the porch.  I was then upon the porch.  The porch was over a little gully, I think.  The porch and the sidewalk are the same.  It was a platform that run right in front of his shop that run along there, and it formed the sidewalk for the public.  It was a wooden sidewalk in front of the house, and it covered a gully about eighteen inches deep.  The flash in my face was a shot from a pistol in the hands of the defendant.  While I was falling I think I heard two more shots, and when I went to raise up my eyes opened.  I did not see where I fell.  There were two shots fired while I was falling, I think, and I fell on my hands and knees and my hat fell off, and when I started to raise I looked around and saw Riddle lying on his back, and I saw the blood in his eye, and when I started to rise, Miller commenced to "bang, bang, bang," just as fast as he could shoot. He commenced to shoot at me before I raised up, and I think I tried to dodge the balls, and I got up and ran off, because I knew if I stayed there—Well, I tried to shoot at him, thinking that maybe he would kill me.  I shot twice.  Two or three days afterwards I went back there and looked over the ground, and I think I must have shot just as I started to raise up.

The defendant did not speak a word just before the first shot was fired, and not a word was spoken by Riddle or me.  The defendant fired just as soon as he could reach for his pistol.  He did not say anything.  We came up by the side of his wall.  I was right close to the wall, and Riddle was right back behind me and a little to the right of me, like this was the side of the wall here and this was the door.  I came right up here and Riddle was standing out there a little to the right.  I think Riddle had his club in his hand when Miller shot the first shot, though I am not positive that he had it.  Neither of us did or said anything when Miller reached down for his pistol, nor after that.  I was in front of Riddle and I could not see him very well, but we were in reaching distance of each other.  I never had seen defendant outside of his house in my life, and had not seen him that morning before we went there to arrest him.  I think it was Miller's hand that shot the shot that killed Riddle.  I was falling and could not see, and the first thing I knew after I fell was Riddle lying on the sidewalk, and of course I am satisfied that Miller shot

him. I do not know how long Riddle lived after Miller shot him, but I heard it was only a short time, about an hour. After that Miller held everybody off there. He stayed in his house, and would not let anybody come there. I heard him cursing in his house; he said, "God damn sons-of-bitches," or something of that sort. I do not know that I can remember exactly what he did say. After I got up and left his door, I got about one hundred feet and shot. I went back there when the other officers came up there, and it was fifteen minutes or a half an hour before he surrendered to them. I do not know that anybody was in Miller's house when we went there, except him. I saw some men out in the street, not far from the door, when we first went up there, but I did not know who they were. I have learned since that they were Mr. Roberts and George Miller. They were right close there. This killing occurred in Dallas, Dallas County, Texas, on the 17th day of June, 1892. Neither Riddle nor I got inside Miller's house on that day. I was just ready to step in his door when he shot at me. The door sill is up probably two or three inches above the grade of the sidewalk. We had no warrant for his arrest, but just arrested him on the information of the witness I told you of; that is, we went to arrest him.

Cross-examined: This shooting occurred on the north side of Elm Street. Going up there I went upon the street car and got off at the corner. The street car line is on Main Street, and we left the street car on Main Street and went over to Elm, and we got on Elm Street on the east side of defendant's shop. When we got to Elm Street we were about two blocks from defendant's shop. We were on the south side of the street when we got to Elm Street, and we walked across to the north side. The street does not make a turn or bend where we got on the north side. It is straight. I think there is a little bend about the railway. I think there is a little bend between George Miller's saloon and defendant's shop. I don't think the street is opened up. I think Conarty's saloon sits out a little on the street from the sidewalk. We were about in front of that barber shop when I spoke to Riddle about drawing our pistols. I think that was about sixty feet from the shoemaker's shop. We were then on the north side of the street. The reason we kept close to the wall of his house in approaching it was to keep the defendant from seeing us. We did not stop and talk about drawing our weapons, but talked about it while we were in motion. I just remarked, that I would take my pistol out, and he said he would get his club. It was a policeman's club; a tolerably heavy weapon. You might kill a man with it if you were to hit him in the right place. It would inflict a serious bodily injury if a man would strike with all his power. It is perhaps a little over a foot long; it is not loaded in any way, but it was larger at the far end than at the place where you take hold of it. His was made of bois d'arc wood. I don't know how much it would weigh; don't know whether

it would weigh a pound or not. My pistol was a 45 Colts. The barrel of the pistol was six or seven inches long; a six-shooter, not a self-cocker. I fire a pistol with my left hand.

I walked with the pistol in my hand all the way down there, until I got to the defendant's shop. I think the shop was about twelve feet square—that is, the front room, the front of it being about twelve feet long. There is a front door on the street and a window on each side of the door, and these three openings would be within that twelve feet in front there. I think it is a double door. I am certain, though, that there are two windows in front there, one on each side of the door. There is glass in the window. I think the sidewalk or platform in front of his door is raised a little. You have to step up to get on it. I think there is a step at the upper end, but I am not certain. You step from the ground on one step, and the next step lands you on the platform. The rise upon the platform would be something like fourteen or fifteen inches, but I did not pay much attention to it. There is no covering over the platform. You might just say, that it was a sidewalk built over a gulley, and it is not a platform proper. It is my impression that you have to take two steps to get upon. it. I was right in front of the door when the shooting occurred, in open view. I don't think I was there more than one or two seconds when the first shot was fired. I had my pistol right this way in my left hand. (Shows how, holding it down by his side.) I stood there a second or two before he fired at me. I think he was at work when I first got there, but I am not certain. He was sitting in his chair, and had no pistol as I saw. I can't say that he had tools in his hands. I suppose he was working at his trade. I could see that he was doing something. He just immediately reached down by his side for his pistol. I did not see where he got the pistol from. It is my impression that he got the pistol from the floor, by the way he put his hand down. At the time he reached for his pistol, I was standing right in front of the door. I think Riddle was standing right behind me, but I did not see him right then. I did not see what he had in his hand, and can only infer. The door of the shop was open. If I had looked, I think I could have seen him through the window before I got to the door. I think there was curtain on the upper part of both windows, but I did not see him until I got in his door. I did not say a word to him. I did not have time to tell him anything before he shot at me. I did not tell him what we were there for. I had no warrant for his arrest. He did not say a word. Riddle said nothing.

After the fuss was over, I found that two of the chambers of my pistol were empty, but I do not remember just when I shot or how often. I could not remember it just afterwards. My mind is a perfect blank as to the time I fired those two shots. I have no impression about it. I do not know how many shots were fired through that difficulty. My impression

is, that Miller fired twice at Riddle and four or five times at me, and I fired twice, which would make six or seven shots fired. I do not know whether Miller changed pistols or not. Just as soon as I came up in the door he made the reach for his pistol, and I knew then he was going to shoot, and I drew my gun to shoot at him, and I pulled up the hammer about half-way, I think, and pulled down on it, and just as I pulled, that flash came in my face. I had drawn back the hammer and was pulling the trigger when he fired. I do not know what Riddle was doing then. My pistol did not go off. Riddle did not fire a shot. I say this positively. I do not know what he did after I fell and before I opened my eyes. Two shots were fired before I opened my eyes, one at me and two more. I did not see the person that fired these shots at the time they were fired, but of course I was satisfied as to who fired them. I saw the flash of one, and heard the other two after I fell. I had not seen Riddle's pistol that morning. I do not know whether it was his custom to carry the chambers of his pistol all loaded or not. I did not see his pistol on the sidewalk after he fell. I saw him taken up from the sidewalk. I don't think I saw any pistol at all near him. A crowd of four or five or five or six ran up there afterwards. I don't know Wesley.

I do not remember if anybody else was in the barber shop besides Anderson when I went in there or not, but I think there was. I do not know, but I think Ed. Bernier was the first person that got to Riddle after he was shot, and he went and talked to Miller, this defendant. He went into the shop where the defendant was. I think some parties came up there in a buggy. I think the defendant pulled his gun on them and told them to move on or that he would kill them. I know some parties drove up there. I do not know for certain what they said, only what I heard afterwards. I think Alexander and Cornwell were the first officers that got there. They all seemed to come about the same time. Cornwell and Alexander are about all I remember now of the police force, but there were so many there I do not remember who all they were. I think I saw Alexander there about ten or fifteen minutes after the shooting. It seemed to me that Riddle had been moved a few minutes before that, but I am not certain. I think Mr. Duffy and some one else came there and took him off, but I do not know who the other one was. They carried him across the street and laid him down on the sidewalk in front of Conarty's saloon. I did not assist in removing him. I was not wounded in the difficulty. I was just ready to step in the shop door when the defendant reached for his pistol; maybe a foot or six inches from the door. I think the defendant was about five feet inside the door, which would make him about six feet at the time. His face was immediately in front of the door; it looked to me like he was fronting the middle of the door. I was outside, opposite to the middle of the door. I do not know whether Riddle fired with his left hand or not; I think he did, though. All I

could see was the motion of his hand.   I had on a police uniform then.
My pistol was in open view when I walked up there.

When he reached or grabbed with his left hand to the floor, I levelled
the pistol with my left hand.   I pulled back the hammer of my pistol
with my thumb, and then I pulled the trigger.   The gun did not go off.
If the hammer had gone back far enough, I expect my shot would have
been before his shot, or about the time, or may be an instant before or
after his, or at the same time, perhaps.   The edge of that platform is
about seven feet from his door, where I fell.   I don't think I fell and
rolled off the platform, but think I just stepped off.   I just stepped out
a hole, and fell on my hands and knees.   I was standing just in front of
the door, and made two or three steps and fell.   I did fall off the platform
into the gutter.   I do not know how long I was lying there.   I just fell,
and started to rise up right away.   I got up and went out in the middle
of the street, and turned two or three times after I got in the middle of
the street.   As I left the gutter I turned around and faced him.   Why,
certainly, I saw the times he fired at me.   I saw him fire all three shots
at me.   Of course I was trying to dodge the shots.   I knew Miller would
kill me if he could.   I can not say how many shots I did see; I knew he
was firing.   I do not know that I saw him fire the first three shots.   I
knew they came from the direction of the door.   I did not see who fired
them, but of course I knew he was the one firing them.   When these
shots were fired I think I was in a stooping position; I was dodging; the
shots came from behind me.   I don't think I was looking back until I got
into the middle of the street.   At the time these shots were fired I was
going out towards the middle of the street, but not right in the middle of
the street, but sorter angling.   I rose erect about the time I got to the
middle of the street.   I heard and saw shots fired after that.   I saw him
fire three shots after I got out in the middle of the street.   I can not say
positively that he fired twice at me while I was running off or not.   It is
impossible to tell all of these things.   I knew that he was trying to kill
me, and I knew I could not help Mr. Riddle any, as he was there dying,
and I wanted to get out into the middle of the street so that I could have
an equal showing.   I went over there across and behind a picket fence.
I think the last shot he fired at me he fired it out of the window.   The
last shot I fired I had my pistol resting on the fence, sorter this way
(pointing in shooting position towards the house).   I got across the street
then.   *   *   *   I did not stay there all the time.   A man came up at
Conarty's with a gun, and when I went around the house I went up to
where he was and tried to get his gun, but he wouldn't let me have it.
I think it was Bob Bolton, and he had a shot gun.   That was after I
leaned my pistol on the fence.   I said I kept my pistol on the fence ten
or fifteen minutes, and that it was four or ten minutes after the shooting,
but I do not remember just the time.   I know I went up to Bolton for

the gun after I left the fence.   Bolton was east of the shop, and I was west of the shop.   Instead of passing the front of the shop, I said I went around the building.   I went south of the building, around the building on the south side of the street.   I think Miller fired the first shot sitting down.   At the time I stood in the door Miller was directly facing me and the door.   As soon as I came to the door, he just made a dive with his hands toward the floor.   It was all done in a second.

George Miller, for the State, testified: I am in the saloon business at 889 Elm Street.   I know the defendant, and knew Riddle, the deceased.   F. P. Miller shot W. H. Riddle with a pistol about the 17th of June, I think, but do not recollect the exact date.   This shooting occurred in front of Miller's shoe shop; defendant's occupation was a shoemaker.   Defendant's shop is about seventy-five feet from my saloon on Elm Street.   I was about fifty feet from Riddle when he was shot.   I was in the middle of Elm Street.   The first I saw of Riddle that morning was about ten minutes before he was killed, and saw him in the front of my saloon.   Tom Early was with him.   They were about passing my saloon, and I called to Riddle, and told him that F. P. Miller was looking for him the evening before, threatening his life.   Riddle said he would arrest him for carrying a pistol in the street.   That morning Riddle and Early came into my saloon, and were asking about defendant carrying a pistol.   Riddle proposed to Early to go and arrest him for carrying a pistol.   They were in there inquriing about it.   They asked me if Miller had been out in the street with a pistol, looking for them.   I told them, "Yes."   Then Riddle said, "Let's go and arrest him, Tom, for carrying a pistol."   They started out of the saloon and drew their clubs.   I called to Riddle and told him that if he was going to arrest Miller that he had better take his gun, because Miller said he was going to shoot him as soon as he got sight of him.   I followed them along out into the street as soon as they went out; by the time I got out into the middle of the street they were attempting to get into Miller's shop.   Tom Early was four or five feet in front.   Tom Early was just about in front of Miller's shop and Riddle just outside when the first shot was fired from the shop at Tom Early.   Then Early tumbled back and fell.   I thought at first that he was shot, but he was not.   Then the same party in the house shot twice at him after he fell.   At that time Riddle reached for his gun, and he had just got out his gun, but did not have time to use it, because just at that time he was shot in the right eye and fell.   After Riddle fell, I ran over to the saloon across the street to see if I could get a gun.   They said they did not have a gun.   They had a side door to the saloon, and I could see over into Miller's shop, and I could see Miller standing behind the bench with a pistol in his hand, and a negro woman was standing by him handing him some cartridges, and he was reloading his pistol.   I do not know this negro woman's name, but she had been staying at his house

for sometime. She has been staying with Miller as long as I have been up there, and I have been up there four or five months. I believe they call her Mattie Henderson. I did not see anybody else in the shop when she was handing him the cartridges. Earl Roberts went out of the saloon with me when I went over there the first time; I called him to go with me.

The evening before the killing, about ten or fifteen minutes before 6 o'clock, Miller came to the barber shop, which is next door to me, with a nigger child in his arms and a pistol in his other hand, and he said " he was looking for those blue coated sons-of-bitches." He said they had been bothering him for sometime, and said they did not do anything else but lie around the saloon and drink whisky, and he said he wanted to kill them and then kill himself. He didn't mention their names, but he said they were the policemen on that beat. After the shooting, when I went back in the saloon, I staid there long enough to see Miller reload his pistol, and then rushed up to Munger's and telephoned for the police wagon about the killing. I saw Miller about ten minutes after this. He said that he would kill the first policeman that came into his house to arrest him, but said he would give himself up to the sheriff. I saw them arrest him and put him in the wagon. I did not see him that morning before the shooting. Threats that I have repeated to the jury I communicated to Riddle and Early ten minutes before the killing. I saw Riddle near where he fell, as near as I can recollect. Riddle was shot just about the eyebrow, over the right eye; that was the only wound that he had on his face. He was bloody then, and was dying. There was not much blood around the wound, but the blood was coming out of his mouth. He must have lived nearly an hour, because he was still alive when they took him home. He died at home. He did not speak a word. He did not seem to recognize anybody after he was shot. I think he was 55 or 56 years old. I have seen the defendant around in that neighborhood for the last five or six months.

Cross-examined: I had been in business west of there five or six months before that. I never knew the defendant before I went where I do business now. I can not see Miller's place of business, standing out in front of mine. I have got to get out in the street to see his shop. There is a kind of elbow in the street, and that obstructs his house from mine. This elbow is about eight feet, I reckon, from my door. A person leaving my shop and going in the direction of Miller's shop would be out of sight of my door when he got ten or twelve feet off. Since I have been in that neighborhood this defendant has had a reputation amongst those people of being a quiet, peaceable, law-abiding, and hard-working man. The evening before the difficulty was the first time I saw him displaying a weapon. I did not mention the fact of his having the weapon to Riddle or Early until about ten minutes before the killing. They did not go into Anderson's shop and inquire about this matter, and then in-

quire of me.  They came from the east side, and Anderson's shop is on the west side.  I was sitting in my saloon and facing the door, and saw them coming.  There is a door that goes from my shop into Anderson's shop, but Riddle and Early came from the east and struck my place first, and I told them about it.  I did not hear them ask Anderson if Miller had been around there with a pistol.  I did not see them until the time I mentioned.  I was in the saloon all that morning.  I was attending to my business.  I did not hear Anderson say to the policemen, that he did not hear anything about it, as he was in his shop shaving his customers. If anything of that kind had occurred there within an hour or half hour, I expect that I would have heard it.

I think these policemen came around by Munger's place.  Nobody in Miller's shop would have seen them before they got within fifty or sixty feet.  You can look out of Miller's shop and see clear to the railroad, about 800 feet.  You could not see beyond my saloon from Miller's shop, but you can stand about Conarty's and see down the railroad.  Coming the way they did would keep the policemen concealed from Miller's shop until they got nearly to it.  They were about passing my saloon when I called to them.  I was talking more particularly to Riddle, but both of them came in together.  I was the first one that mentioned Miller's name. I told Riddle to be careful, because Miller had been round there looking for him with a pistol the evening before, and said he would kill at sight. I spoke this to Riddle.  I told him that Miller was looking for him and Tom Early.  Riddle said he had been told all about it that morning; that Miller was looking for him with a pistol, and that he come up to arrest him for carrying a pistol.  After I had this conversation, I did not say anything further to Riddle.  They drew out their clubs.  Riddle said, "Come on, Tom, we will go and arrest him now."  That is what they said when they started off.  I did not call them back, but when they were going out I said, "If you want to arrest this man, you had better get your pistols out, and get them ready, because he is going to shoot you."  Riddle said, "I don't think he is going to shoot."  Tom Early had his gun out, but Riddle didn't have his out.

I told both of these men, when they started round there, to get their guns out; that this man would kill them on sight.  Riddle kept his club out, but said he did not think the defendant would shoot.  I did not tell these men about his talk the evening before, but I told them about his threatening their lives.  I told them that he looked like he meant business; that he said he was going to kill them, and I believed he would do it.  I did not tell them that Miller looked like a crazy man, or that he looked like he was wild.  He did look like he was excited.  I reckon that it was understood up there that Miller did not drink and spend his money much, but I never heard him spoken of.  He looked to me like he was mad when he had his pistol.  He said he was going to kill these

men on sight when he saw them. He was in the barber shop talking to Anderson first. He came back in the street after this, but he did not come back to the same place. The second time he came back he was talking to the barber. I did not see his pistol the second time he came out. When he was talking about killing the policemen, he said something about the woman he was staying with. He said that he had a cook, and that people talked about it. I do not remember that he ·said that they had been bothering him to death, and threatening him, and sending messages to him, and worrying the life out of him. I did not hear him say that they talked about mobbing him and burning his house down. I believe I did hear him say that they worried him, and that he tried to behave himself and attend to his own business. I think I did hear him say that if they came on him, he would kill them and then kill himself, and that he was tired of living anyhow. No, sir, he did not say that evening that if they had anything against him, let them arrest and prove it according to law, and it would be all right. He did not say anything about being arrested either. He did not say that if they had any charge against him let them prove it according to law. No, he did not seem to be talking against anybody else that might come in to his shop to pester him, as much as he was talking about the policemen. He mentioned these two policemen. He said, " that damned gray-headed fellow and Tom Early." I did not hear him say that this is a curious country; that when a man stays at home and attends to his own business and bothers nobody, that he had to buy a pistol and keep it to protect himself with.

When these men left me that morning to go around to Miller's shop, Tom Early had his pistol in his hand, behind, sorter hid. It was not under his coat. He was walking with his pistol still behind him when he went towards the shoe shop. He did not expose his pistol until he was shot at the first time. He went down there with his hands behind him, this way. Miller shot at Early before Early could see him. I know it was unexpected. Early was not expecting to be shot at. The way that shop is situated, you can see more from the outside than you can from the inside. Tom Early did not pull his pistol until after he fell. He fell with his pistol still behind him. Two more shots were fired at Early after he fell. When Early fell he fell off the sidewalk. He was standing on the edge of the sidewalk when he was shot at the first time. When Miller fired the first shot at Early, he fired it from the inside of the house. There is a door, and next to the door in the shop, fronting the street and west, there is a window. Tom Early was standing more to the west side of the door, and he was three or four feet from the door, with his pistol behind him. When Miller shot, Early stepped back and fell off the sidewalk and threw up his hands, and this was the first time the pistol came from behind him. Miller shot through the window. The second two shots he fired at Early were through the window. All of this time Rid-

dle was trying to get his gun out, and as soon as Riddle got his gun out,
Miller shot him.   He did not have it out so that he could shoot with it,
but he was just getting it out of the scabbard, when Miller shot him; that
was the fourth shot by Miller.   Riddle did not shoot at all.   He fell as
soon as he was shot.   In the meantime Early ran over across the street.
I did not see Early shoot at all.   I did not see any one shoot except
Miller.   He shot at Riddle once that I saw.   The second time that he
shot at Riddle I was going up the street, and I did not see him shoot the
second shot at Riddle, but I heard it, and that is all I know about this
second shot at Riddle.   Up to the time Early fell out in the street, he
had not shot a single shot.   Tom Early was across the street when I went
up to the saloon.   Early was close to the fence, or behind the fence, but
I could not see him when he was there, and could not say exactly where
he was.   Then I turned around and left there.   Riddle was lying on the
sidewalk and Early was out of sight, and Miller was back in the house
somewhere.

There is no window in the east side of the shop door.   There is a win-
dow on the west side of the shop door.   A man coming along from the
east could not be seen from the shop through any window, but he would
have to get nearly in front of the door before he would be seen.   I never
saw Miller working in front of the door facing the street.   He sat on the
west side of the door about five feet in the room opposite to this window,
and he sat in front of the little goods box he used as a work bench.   He
sat facing the east.   That box is there yet.   This shop is on the north
side, facing south.   The door is a double door.   The room is eight or ten
feet wide, I reckon.   He used as work bench a little goods box that was
on the right side of the window, and he worked during the whole five
months I have been up there.   I went up there expecting to see some
shooting, but I could not see Miller where I was.   I had not passed that
shop that morning before that, but passed there that day after the shoot-
ing, and that box was sitting at its accustomed place. . I do not know
where Miller's tools hung.   I did not see where Miller was sitting at the
time the firing opened.   After the shooting, I went in there and exam-
ined his room.   I did not see a bullet shot directly behind where Miller
sat.   I don't remember seeing any tool on the floor.   I was in there with
George Garrison, a policeman, and was looking for pistol marks.   I saw
a pistol ball just where the shoemaker's sign was, and it seemed to go
through the sign into the ceiling.   This is the shot that Tom Early claims
to have shot from the outside.   I told George Garrison to look for shells;
we found three or four.   We did look for shots in the side of the house,
and we looked for a hole back behind where Miller sat, but I did not see
any.   I saw some tools in there and some shoes, but I did not notice any
tools back behind where he sat, but I took no particular notice of them.
I looked on the floor to see if anything had cut the floor, but I did not

see anything of the kind there.    I saw that bullet hole in front of the house; it come from the outside.    I saw a hole through the wall, or through the door facing, fired from the inside.    Riddle was east of the door about a foot when he was shot.    I saw a bullet hole that was shot through the door facing, angling east.

Question.    Taking the direction the ball went, wasn't the shot from right at the point where Miller sat when he was at work; or shot that way, wouldn't it have gone through the facing within about an inch of the facing in that way?

Answer.    I saw this; it would have been fired just at the point to where this man was at.    This hole that went diagonally through the wall was in the facing of the door.

Question.    The point that Early was at; when Early was firing, he was some to the west, and the other shot you think was fired out the window at him?

Answer.    Yes, sir.

Question.    I am trying to find out whether this shot was fired at Early or not.

Answer.    Yes, I think so.    After the shooting Miller was holding everybody off, and said he would not give himself up to the police officers.    I did not hear him say for some of us to go for Henry Lewis at once; that he wanted to surrender to Henry Lewis.    I believe I did hear him say that he would not give himself up to a policeman, but that he would give up to the sheriff.    He always said from the start that he did not want to give up to the policemen.    I did not hear him say if he gave up to them he would be killed.    He did say that he would not give himself up to any son-of-a-bitch of a policeman, but if the sheriff came he would give up to him.    I never heard him say he was afraid to give up to a policeman, or that he would be killed if he gave up to them.    He did surrender afterwards, and I think gave himself up to a policeman, but I was not there.    There were three shots fired at Tom Early, I think; three or four, I am not certain.    The first shot was fired at Tom Early when he got in front of the door.    At that time Tom Early's hand was behind him, and his pistol was in it.    He stepped backwards and fell off the pavement, and after he fell he threw up his hands, and that was the first time his hands came from behind him.    The second shot was fired at Tom Early through the window.    When the third shot was fired Early was trying to get up.    I think he was trying to get his pistol and shoot at Miller after Miller shot the second shot.    Between the second and third shots Tom Early tried to get his pistol and shoot at Miller.    After the third shot was fired, Early got up and ran across the street.    I am not certain whether there was a fourth shot at Early or not.    The next shot was fired at Riddle, and he fell.    This was the last shot I saw.    After I got over to Pat Conarty's and saw Miller reloading his pistol, I never saw any more

shots fired from the house, but I heard more. I heard one more shot when I went up to Munger's to telephone for the police, but I do not know who fired it. The evening before, when I heard what Miller said about the policemen, Earl Roberts, Charlie Norville, and about a half a dozen others were around there, whose names I can not recollect. A lot of men who had been working at Munger's heard a part of it. The second time that Miller came around there that evening, about the same crowd was around and heard him. One of the barbers heard it, Anderson; but I do not think Wesley was there. I know that Anderson heard Miller talking about Miller both times. Miller's seat was a low chair. It is about three inches lower than this one. I believe about three or four inches lower than an ordinary chair. I never saw it before the killing, but I examined it afterwards. When I saw him reloading his pistol he was standing up.

On redirect examination: There might have been some shots fired into Miller's building after I went up to Munger's, but I don't know. I heard five or six shots. There was no firing from the outside of the building that I saw. I am positive about this. It was about the fourth shot that killed Riddle. I saw the shot when it struck him in the head. I did not see the pistol in the defendant's hands. I did not get round far enough to look into the door. I did not see that fifth shot fired at all. I do not know whether it was fired from the outside or the inside of the house. I can tell from splinters which way the shot went easy enough. That was on the east side of the facing. (The shot in the door facing from the inside of the house.) That shot was directly in the direction of Riddle. The other shot that came from the outside went through Miller's sign and lodged in the ceiling. I do not know if any inquest was held over the dead body of Riddle or not. I never testified at any inquest. When Riddle was shot I was out in the street, about forty feet east of the shop. I was in the middle of the street. Riddle was facing Miller at the time he was shot. He was facing towards the place where the shot came from.

Fred Floor testified, in substance: That the evening before the killing he was in defendant's shop and heard the defendant and a white man in conversation. The man told defendant that Riddle said he wanted to get his hand on him, and the defendant said that he would kill that gray-headed old son-of-a-bitch Riddle, or any policeman that stepped upon his gallery.

Earl Roberts, in substance, corroborated the witness George Miller as to the acts, conduct, and threats of the defendant on the evening prior to the killing, and also as to the circumstances attendant upon the killing, which he witnessed. He testified that Miller was in a rage the evening before the killing, and was talking about the policemen, and said some one had told him they were watching him and wanted to get hold of him

about living with a negro woman.  He said, "I am not drunk, but crazy." That if they bothered him, and worried the life out of him, he would kill them and blow his own brains out, and he tapped his finger on his forehead when he said it.

D. S. Wilson, in substance, testified:  That he was present the evening before the killing, and heard the defendant's threats against the policemen.  Defendant had his pistol in his hand, and said, "I am going to kill the first officer that passes my door; they have been prowling round my place long enough, and have been bothering me, and I am not going to stand it any longer.  I don't care if I die; I am going to get one or two of them before I die.  I am not drunk nor crazy, but mean just what I say."

Dr. Thompson, a physician, examined Riddle's body, and found two wounds, one through the left arm and another above the left eye, and was of the impression that both wounds were made by the same shot.  That his left arm was raised in front of his head at the time of the shot, and it passed through the arm before entering the head.  It was the shot in the forehead which killed him.

William Dresser, in substance, testified:  That he did not witness the shooting, but was the first person to enter the shop after the shooting. Miller had his pistol in his hand; had not been arrested.  Riddle had been carried across the street to Conarty's saloon, and they were pouring some liquid into his mouth, and Miller said, "You can pour it down the son-of-a-bitch, but he is gone, and I will get another one before they get me."  I examined the walls for balls and bullet holes.  Did not find any balls, but found some holes in the handles of some tools that were hanging on the wall at the rear end of the shop, two or three feet from the floor, and a little to the left of the door as you enter from Elm Street. The handles of two or three of these tools were split.  The place where these tools were hanging would be on a line with a person standing on the right hand and not on the left hand side of the door as you enter.  I was with the defendant in the shop alone several minutes before the officers came and arrested him.

Tom Wilson, in substance, testified to seeing and hearing defendant making threats the evening before the killing; said he would kill both the damned sons-of-bitches, and then kill himself.  This witness heard the shooting when the killing occurred; heard four or five shots, and then describes the manner in which they were delivered—the first and second being pretty close together.  Did not see any of the parties except the man on the outside.  Never saw either of them until the shots were fired. As I looked around, I saw Riddle fall; he fell before Early fell into the gutter.  They fell near about the same time, but Riddle fell first.  When the first shot was fired, I turned, and he was falling backwards.  Did not see Riddle fire at all.  Early shot twice as he was going across the street.

There were several shots fired at him out of the building. The witness was shown a diagram, and gave his opinion as to the probable range of shots, and said: "I think a shot fired from the east side of the door and entering the wall at a point indicated, would be in range with Miller's seat. A shot fired at him from the window, if correctly fired, would not strike the west wall at all. Approaching the shop going east on Elm Street, one would have to turn round to see Miller in the shop. Going west, on getting to the door, Miller would be in front of it. Early, as he was going away, in his position, if he had been shooting through the window, could not have hit the west wall. Riddle fell to the east of the door, sorter in front of the east front of the facing of the door."

It is not deemed necessary to give the other testimony adduced by the State, as it was simply corroborative of that of some one of the witnesses above.

The defense recalled Earl Roberts, and examined him with reference to the shot holes as shown by the diagram. He also stated, that just as Early was shot at, old man Riddle had his club in his hand, and just throwed his hand behind him and jerked his pistol out. He was in that position when shot. That was after the first shot fired by Miller, to the best of my knowledge. I don't think Riddle fired his pistol.

V. J. Kirkham was examined with reference to the diagram, and gave his opinion as to the range of the balls.

Captain J. C. Arnold, chief of police, testified to his examination of Early's pistol after the killing; thinks that probably two of the chambers had been freshly discharged.

Tom Duffy testified as to his presence and participation in the arrest of the defendant, after the killing.

Cornwell, Alexander, Miner, and George Miller testified, in rebuttal, that Duffy was not there in the house at the arrest. The following are the diagrams used by the defense:

In his opinion, it will be seen that Presiding Judge HURT characterizes the charge of the court to the jury as a "most admirable application of the law to every feature of the case." He further says, "it was sufficient without the requested instructions given, but those given at the request of the defendant rendered it unquestionable." The entire charge is as follows, viz.:

"1. Gentlemen of the jury: The defendant, F. P. Miller, is on trial before you upon an indictment charging that on the 17th day of June, 1892, in Dallas County, Texas, said defendant did unlawfully, with his express malice aforethought, kill one W. H. Riddle, by shooting him with a pistol. To this indictment the defendant has pleaded not guilty, and under the law, he is to be presumed to be innocent until his guilt is established by legal evidence beyond a reasonable doubt.

"2. There are three several offenses comprised in this indictment—murder of the first degree, murder of the second degree, and manslaughter; and under the evidence it becomes necessary to instruct you upon the law applicable to each of said offenses. It is also necessary to instruct you upon the law of justifiable homicide.

"3. Murder is thus defined by our statute: 'Every person, with a sound memory and discretion, who shall unlawfully kill a reasonable creature in being, within this State, with malice aforethought, either expressed or implied, shall be deemed guilty of murder. Murder committed upon express malice is murder of the first degree; murder committed upon implied malice is murder of the second degree.'

"4. The term malice, in its legal sense, means the intentional doing of a wrongful act toward another, without legal justification or excuse. It is a state or condition of the mind showing a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts done or words spoken.

"5. Express malice exists where one with a sedate and deliberate mind and formed design unlawfully kills another, which formed design is evidenced by external circumstances discovering that inward intention, as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm, or any other circumstances showing such sedate and deliberate mind and formed design to kill, or inflict serious bodily harm which might probably end in the death of the person upon whom the same was inflicted.

"6. No definite and specific length of time can be defined and fixed within which to form the state or condition of mind constituting express malice, nor for which such condition shall continue, but it is sufficient if it did exist at the very time when the homicide was committed, and that the defendant acted upon it; and that his act was not the result of a rash, hasty, and inconsiderate impulse, but a preconceived and deliberate de-

sign to kill, or do bodily harm to the deceased which might probably result in the death of the deceased.

" 7. However sudden a killing may be, if the means used or the manner of doing it, or other external circumstances attending it, *indicate* a sedate mind and formed design to kill or to do great bodily injury, and a murder be committed, it will be upon express malice, and murder in the first degree.

" 8. Express malice is a distinct and affirmative fact, which must be proved by the State from all the facts and circumstances in evidence, to justify a conviction for murder in the first degree, and is never to be presumed or inferred.

" 9. Implied malice is that which the law infers from or imputes to certain acts; thus, when the fact of an unlawful killing is established, and there are no circumstances in evidence which establish the existence of express malice, nor which tend to mitigate, excuse, or justify the act, then the law implies malice.

" 10. Murder of the first degree is punished by death or confinement in the penitentiary for life, at the discretion of the jury. Murder of the second degree is punished by confinement in the penitentiary for any term not less than five years.

" 11. Manslaughter is voluntary homicide, committed under the immediate influence of sudden passion arising from an adequate cause, but neither justified nor excused by law.

" 12. By the expression ' under the immediate influence of sudden passion ' is meant, that the provocation must arise at the time of the killing, and that the passion is not the result of a former provocation, and the act must be directly caused by the passion arising out of the provocation, if any, at the time of the killing. It is not enough that the mind is merely agitated by passion arising from some other provocation, or a provocation given by some person other than the party killed.

" 13. The passion intended is any of the emotions of the mind known as anger, rage, sudden resentment, or terror, rendering the mind incapable of cool reflection.

" 14. By the expression ' adequate cause ' is meant such as would commonly produce a degree of anger, rage, sudden resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. Any condition or circumstance which is capable of creating and does create sudden passion, as anger, rage, sudden resentment, or terror, rendering the mind incapable of cool reflection, whether accompanied by bodily pain or not, is deemed adequate cause.

" 15. In order to reduce a voluntary homicide to the grade of manslaughter, it is necessary not only that adequate cause existed to produce the condition of mind known as anger, rage, sudden resentment, or terror, such as to render it incapable of cool reflection, but also that such

state of mind did actually exist at the time of the commission of the offense, and that it was produced by such adequate cause.

"16. Manslaughter is punished by confinement in the penitentiary for not less than two nor more than five years.

"17. If on the day before the killing of the deceased, the defendant was on a public street of Dallas, carrying in his hand a pistol, he was violating the law of Texas, for which he was subject to arrest by any policeman in the city of Dallas, with or without warrant; and if the deceased (Riddle) and Early, being then policemen of the city of Dallas, were informed by any credible person of such violation of the law by defendant, it became their duty to arrest the defendant for such violation of the law, and it was not necessary before making such arrest that they should procure a warrant for the arrest.

"18. In making the arrest, Riddle and Early were authorized by law to use all reasonable means to effect it. They were not authorized, however, to use any greater force than was necessary to secure the arrest and detention of the accused; and what force was necessary to secure the arrest and detention of the defendant is a question of fact to be determined by the jury, from all the facts and circumstances in evidence.

"19. If you believe from the evidence, that in Dallas County, Texas, on or about the 17th day of June, 1892, the defendant, F. P. Miller, did unlawfully kill W. H. Riddle by shooting him with a pistol, with a sedate and deliberate mind, and previously formed design so to do (and as to such deliberation and formed design you must determine, from all the facts and circumstances in evidence before you, if any, tending to show the same), then such killing would be with express malice, and you will find the defendant guilty of murder in the first degree, and assess his punishment at death or confinement in the penitentiary for life, at your discretion.

"20. If you believe from the evidence, beyond a reasonable doubt, that in Dallas County, Texas, on or about the 17th day of June, 1892, the defendant, F. P. Miller, did unlawfully kill W. H. Riddle by shooting him with a pistol, but should not believe from the evidence, beyond a reasonable doubt, that the killing was done with express malice (as herein before defined), and should not believe that the evidence is sufficient, under the law as given you in this charge, to reduce the offense to manslaughter, nor to justify, mitigate, or excuse the defendant's act, then from such unlawful and intentional killing the law would imply malice, and the killing would be upon implied malice, and would be murder in the second degree; and you will find the defendant guilty of murder in the second degree and assess his punishment at confinement in the penitentiary for any term not less than five years.

"21. If the defendant killed the deceased, Riddle, as charged in the indictment, but at the time of the killing the defendant was not actuated

by express malice, but was under the influence of a rash, sudden, and hasty impulse, or under the influence of sudden anger, rage, resentment, or terror, then, unless such state of mind was produced by some ' adequate cause' as herein before defined, the offense was murder of the second degree, unless the killing was done under circumstances which under the law justify or excuse it; but if such ' adequate cause' did exist, and produced such sudden anger, rage, resentment, or terror, such as rendered the mind of the defendant incapable of cool reflection, then the offense was manslaughter, if not justified or excused by law.

" 22. If you believe from the evidence that the defendant, F. P. Miller, in Dallas County, Texas, on or about the 17th day of June, 1892, did unlawfully kill the said W. H. Riddle, as charged in the indictment, but that at the time of the killing, he, the said defendant, was by some adequate cause moved to such a degree of anger, rage, sudden resentment, or terror as to render him incapable of cool reflection, and that in such a state of mind (and not in his lawful self-defense) he killed the said W. H. Riddle, then you will find the defendant guilty of manslaughter, and assess his punishment at confinement in the penitentiary not less than two nor more than five years.

" 23. If you believe from the evidence that the deceased, W. H. Riddle, and Tom Early went to the defendant's shop to arrest the defendant upon the charge of unlawfully carrying a pistol, and that they carried in their hands, or either of them carried in his hand, a deadly weapon or weapons calculated to produce death or serious bodily injury, and appeared thus armed at defendant's doorway, and that the appearance of such person thus armed, or their attempt to use such weapons, if they did so attempt, or anything then done by Riddle or Early was such as would commonly produce a degree of anger, rage, sudden resentment, or terror in a person of ordinary temper, under like circumstances with the defendant, as to render the mind incapable of cool reflection; or if you believe from the evidence that the said Riddle and Early, in attempting to arrest the defendant, were using greater force than was under the circumstances necessary to secure the arrest and detention of the defendant; or that they had time and opportunity to inform him by what authority they were about to arrest him, and having such time and opportunity failed to inform him, and that their manner of attempting such arrest was such as would commonly produce such degree of anger, rage, sudden resentment, or terror in a person of ordinary temper, under like circumstances with the defendant, as to render the mind incapable of cool reflection, and that the defendant was moved by such cause to such degree of anger, rage, sudden resentment, or terror as to render and as did render him incapable of cool reflection, and that while under the influence of such sudden passion he shot and killed the said Riddle, at the time and place as charged in the indictment, then you will find the defendant guilty of manslaughter,

and assess his punishment accordingly; unless you should find and believe from the evidence that the killing was done in his lawful self-defense, under the law as herein after given you in this charge.

"24. The law requires that in making an arrest the officer must make known to the accused by what authority the arrest is made, and if he has the time and opportunity to thus make known his authority it is his duty to do so. Whether or not Riddle and Early had the time and opportunity to inform the defendant by what authority they were about to arrest him before he fired his pistol, is a fact to be determined by the jury.

"25. If you believe from the evidence, that the defendant did kill the deceased, Riddle, as charged in the indictment, but should further believe from the evidence that at the time the defendant took up his pistol and fired the first shot fired by him, the deceased (Riddle) or the policeman Early was attempting to use upon him a deadly weapon, or by some act done by said Riddle or Early at the time, reasonably indicated to the defendant, and created in the mind of the defendant a reasonable expectation or fear that they were or either of them was about to make an unlawful attack upon the defendant with a weapon calculated to produce death or serious bodily injury, then it would be presumed from such act that they intended to make use of such weapon to kill the defendant, or to inflict serious bodily injury upon him, and you will in such case acquit the defendant as having acted in his lawful self-defense.

"26. If the acts of Early or Riddle were such as to justify the defendant in killing Riddle under the law of self-defense, as given you in charge, then the defendant was not under the law required to retreat in order to avoid the necessity of killing the deceased.

"27. If you believe from the evidence that the deceased (Riddle) and the policeman Early, when they appeared at the door of defendant's shop, by some act done by them, or either of them, indicated a present purpose and immediate intention to use upon the defendant a weapon which might probably cause his death or serious bodily injury, or if the acts of said Riddle or Early reasonably so appeared to the defendant at the time, from his standpoint, and said acts of the deceased or Early at the time were reasonably calculated to create in the mind of the defendant, and did create in his mind, the reasonable expectation or fear of death or serious bodily injury; and if you find then and there the defendant, moved by such reasonable expectation or fear, if he was so moved, of death or serious bodily injury, killed the said Riddle, then the killing was under the law justified as done in his lawful self-defense, and you will acquit him, even though the danger was not actual, but only apparently so; provided, the danger reasonably appeared to the defendant, under all the facts and circumstances at the time, to be real and actual, viewed from the defendant's standpoint.

" 28. If, however, you should believe from the evidence, beyond a reasonable doubt, that the defendant drew his pistol and fired upon Early and Riddle, not for the purpose of protecting his person from unlawful violence from either of them, nor for the purpose of preventing an illegal arrest, but for the purpose of killing Early or Riddle, or of preventing them from lawfully arresting him, then he can not justify the killing of Riddle, if he did kill him, as done in his lawful self-defense.

" 29. The burden rests upon the State to establish the guilt of the defendant by legal evidence, beyond a reasonable doubt; and if after considering all the evidence before you, you have a reasonable doubt of his guilt, you will acquit him; but if the evidence satisfies your minds, beyond a reasonable doubt, of the guilt of the defendant as charged in the indictment, then you will convict him, and ascertain from the evidence, under the charge of the court, the grade or degree of the offense, under the indictment, of which he is guilty, and assess his punishment therefor accordingly.

" 30. You are further instructed, that the reasonable doubt applies also between the different offenses comprised in the indictment; so if you find the defendant guilty, and have a reasonable doubt under the evidence as to what offense he has been guilty of, you will resolve such doubt in favor of the defendant, and find him guilty of the lesser and lower offense as between such offenses as you may be in doubt concerning; and if you have a reasonable doubt of the defendant's guilt of any of the offenses comprised in the indictment, you will acquit him.

" 31. You are the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony.

" 32. If you find the defendant guilty of murder of the first degree, let the form of your verdict be, ' We, the jury, find the defendant, F. P. Miller, guilty of murder in the first degree, and assess his punishment at,' stating, ' at death,' or ' at confinement in the penitentiary for life,' at your discretion.

" 33. If you find the defendant guilty of murder in the second degree, let the form of your verdict be, ' We, the jury, find the defendant, F. P. Miller, guilty of murder in the second degree, and assess his punishment at confinement in the penitentiary for the term of,' stating a term of not less than five years.

" 34. If you find the defendant guilty of manslaughter, let the form of your verdict be, ' We, the jury, find the defendant, F. P. Miller, guilty of manslaughter, and assess his punishment at confinement in the penitentiary for a term of,' stating a term of not less than two nor more than five years.

" 35. If you do not find defendant guilty of any of said offenses, let your verdict be, ' We, the jury, find the defendant, F. P. Miller, not guilty.' "

The following special instructions were given by the court at the request of defendant:

" 1. The defendant's right of self-defense, as given you in charge, would not be impaired by the fact, if it be a fact, that he had made previous threats against the deceased, but he would have the same right to defend his life and his person as if no such threats had been made.

" 2. You are instructed, that in making an arrest all reasonable means are permitted to be·used to secure the arrest and detention of the accused, but that no greater force is permitted than is necessary for that purpose; and if greater force than necessary was used by Early and Riddle in the attempted arrest of the defendant, the same was illegal, and the defendant had the lawful right to resist it, and if necessary or apparently necessary in his self-defense, to kill the party or parties engaged in such unlawful attempt.

" 3. You are instructed, that you will disregard the arguments of State's counsel relating to the defendant's domestic relations or employment of a negro woman. You are also instructed, that no legal arrest of the defendant could be made upon a charge of adultery, or for threats. made, without a warrant, and that there is no pretense in this case that the arrest of this defendant was sought to be made upon any charge other than a charge of unlawfully carrying a pistol. You are further told, that there is no evidence of any illicit relation between the defendant and the negro woman, and the same, if it was a fact, has no bearing upon this. case, and you will not in anywise consider the same in your deliberations.

" 4. If Early used unlawful violence against the defendant, or if the acts and conduct of Early were reasonably calculated to induce the defendant to believe, and he did believe, that he was about to be attacked with a deadly weapon, and that he was in danger or apparent danger of death or serious bodily harm, and the deceased, Riddle, was present at the time, and that his conduct and the circumstances of the occasion were such as to cause the defendant reasonably to believe, and that he did believe, that Riddle was acting with Early in committing a deadly or apparently deadly assault upon him, then the defendant would be justified in defending himself against each and all parties that he believed and reasonably had cause to believe were engaged in assailing or apparently were about to assail him.

" 5. If the jury believe from the evidence, under the charge of the court upon the law of self-defense, that the defendant was justified in firing the shot that killed the deceased, Riddle, if any, then you are instructed, that the subsequent shots fired by the defendant, if any, are immaterial and will not be considered by you.

" 6. If the jury believe from the evidence under the foregoing charges of the court upon the law of self-defense, that the defendant was justi-

fied in firing the first shot made by him, if any, then you are instructed, that the defendant had the right to continue to fire so long as the danger, real or apparent, considered from the defendant's standpoint, continued to exist.

" 7. If you believe from the evidence, that the meeting between the defendant and Early and Riddle was not sought by the defendant, but was accidental so far as he was concerned, and that the defendant, though armed, if he was armed, made no attack upon the deceased, and made no hostile demonstration towards the deceased, and that the first hostile demonstration, real or apparent, was made by the deceased and Early, both or either acting together, and that such demonstration was of such a character, in connection with all the surroundings and circumstances, as to create in the mind of the defendant, from his standpoint, a reasonable apprehension of death or serious bodily harm, then about to be inflicted upon him by the deceased or Early, or both, acting together, and that under such circumstances defendant shot and killed the deceased, the killing would be justifiable, and if you so believe, you will acquit the defendant.

" 8. If you believe from the evidence, that Riddle was acting with Early in an attack upon defendant, or if Early or Riddle, or either or both, then made an attack upon defendant, or if the appearances were such as to cause in the mind of defendant a reasonable belief, and did cause such belief, that Riddle was a party to an attack upon him, or which was then about to be made upon him by Early or Riddle, or both or either of them, then the defendant's right of self-defense would extend to the acts of each and all of the parties, because the violence of one of them would be that of both. Thus, if Early assaulted defendant with a deadly weapon, or was in the act of doing so, or if it reasonably appeared to the defendant, from the acts and conduct of Early at the time, that he, Early, was then about to attack him with a deadly weapon, and Riddle was present, encouraging and aiding said assault, or apparently taking part therein, or if the appearances were such as to cause the defendant to believe, and he did believe, that Riddle was participating, or was about to participate in such attack, defendant would have the same right to defend himself against the deceased, Riddle, that he would have to defend himself against Early, although Riddle may not have used or attempted to use any violence upon him."

*Bassett, Seay & Muse,* for appellant.—1. The conviction for murder in the first degree is not supported by the evidence, in that it appears that the defendant was not of sedate and deliberate mind at the time of the homicide. McCoy's case, 25 Texas, 37; Farrar's case, 42 Texas, 271.

2. The court erred in refusing to change the venue of his own motion, as requested by the defendant in his application for a continuance.

Steagald's case, 22 Texas Cr. App., 464; Massey's case, 31 Texas Cr. Rep., 371.

3. The defendant's application for continuance should have been granted, because of the existence of prejudice and combination alleged, and the materiality of the absent testimony tending to show the condition of his mind, and the standpoint from which he acted, together with his reputation for peace and quiet.   Steagald's case, 22 Texas Cr. App., 464; Massey's case, 31 Texas Cr. Rep., 371; Willson's Crim. Stats., sec. 2165; Wilson's case, 18 Texas Cr. App., 577.

4. That the court erred in admitting, over objection, as being irrelevant, incompetent, and hearsay, the testimony of Early, Miller, and Lamar, in relation to the purpose of Early and Riddle to arrest defendant without a warrant for carrying a pistol and raising a disturbance, upon a communication made to them after the completion of the offense and the return of the defendant to his shop, and the statements of Miller and Conarty to Early and Riddle as to the dangerous character of the defendant, the inquiries and conversations of Early and Riddle with others, and between themselves, in relation to the dangerousness of the defendant, and the method and purpose of securing his arrest.

(1) The evidence was hearsay, and put in issue the defendant's character as a dangerous man, without reference to his reputation therefor.  The evidence was irrelevant and prejudicial, and its admission over exception constitutes reversible error.   Willson's Crim. Stats., sec. 2499; Felder's case, 23 Texas Cr. App., 485–489; Johnson's case, 21 Texas Cr. App., 379, 380; Chumley's case, 20 Texas Cr. App., 556, 557, and authorities cited.

(2) The evidence was further incompetent, and its admission error, in that it tended to justify and legalize an attempted arrest without warrant upon a communication of a misdemeanor committed made after the completion and termination of the offense.   Willson's Crim. Stats., secs. 1440, 1441, 1722, 1728; Code Crim. Proc., arts. 226, 229; Jacob's case, 28 Texas Cr. App., 79.

(3) If otherwise competent in relation to the communication of the misdemeanor, there was no proof that the communication was made by a credible person, and as against the defendant the evidence was inadmissible, as tending to authorize his arrest without a warrant therefor.   Penal Code, art. 322; Code Crim. Proc., arts. 236–239; Kitchen's case, 29 Texas Cr. App., 45; Jacob's case, 29 Texas Cr. App., 79–85, and sec. 3 of syllabus.

(4) The statement made to the officers that the defendant was a dangerous man was the conclusion of the witnesses, without the facts upon which the same was based, and was irrelevant and hearsay, and calculated to prejudice the defendant with the jury.

The other portions of the elaborate brief of counsel for defendant were devoted to objections to and criticisms upon the charge of the court, and the discussions of the rulings of the court upon refused special instructions asked. Having given the charge of the court in full, we do not deem it necessary to state the propositions and authorities cited in the brief in connection with the supposed errors insisted on by counsel.

*R. L. Henry*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—On the 17th day of June, 1892, F. P. Miller, the appellant, shot and killed W. H. Riddle in the city of Dallas. He was indicted for murder on the 18th day of June, and was tried and convicted on the 23rd day of July, 1892, the verdict and judgment being for murder in the first degree, with the death penalty assessed.

Counsel for appellant submitted an able oral argument and elaborate brief, assigning numerous errors as reasons for reversing the judgment. We have very carefully examined all the errors relied upon by counsel, but will notice in this opinion such as we deem of importance.

Error is assigned relating to the empanelling of the jury. It is urged that Morgan was disqualified, and that he sat in judgment upon appellant's case. S. T. Morgan being called, on cross-examination by defendant, stated that he had formed a conclusion in relation to the defendant's guilt, but that the same would not influence his verdict; that it would require evidence to remove his opinion, but that his verdict would not be influenced thereby. He had no bias or prejudice in favor of or against the defendant. That he had read and heard of the meeting of the citizens at the city hall, advising the lynching of the defendant; also of the attack upon the jail. That he did not approve of mob law in this case, but did approve of mob law in some cases. If Morgan had reached the conclusion that defendant was guilty, was this a fixed and settled conclusion? If so, he was disqualified. Was his opinion so entertained as to become a fixed belief of the appellant's guilt? If so, he was not competent to try the case. In ascertaining the character of his conclusion, the source of the juror's information becomes of the first importance. Had he witnessed the transaction? Was he informed of the facts, talked with a witness or witnesses, read a statement of the evidence, or was his opinion founded upon vague rumors? None of these questions are answered by this record, and hence we are not prepared to reverse the ruling of the learned trial judge who tried this case.

Appellant applied for a continuance of the case, which was denied, and he assigns this for error. There are two grounds set up: first, "that there exists in Dallas County a dangerous combination against him, instigated by influential persons, which will defeat a fair and impartial trial of this case at this term;" second, "that defendant can not safely go to

trial without the testimony of Mrs. Kirkham and E. A. Kirkham." By these witnesses appellant expected to prove his good reputation. This is no ground for a continuance. "That parties whose names can not now [at time of trial] be recalled by defendant came to his shop, and told him that the police of the city of Dallas would do him up, and kill him; that defendant was greatly alarmed and disturbed thereat, and on account thereof armed himself for protection; that defendant expressed his apprehension of injury, and requested that the witnesses, should they hear parties in his house, to awaken and notify him; that said witnesses lived in the same house with him, and that he was their tenant." This application is greatly wanting in particularity and specification. What policemen of Dallas threatened to kill defendant? Did Early or Riddle make threats? When were the threats made, and when were they communicated to appellant? Were they made just before, or one or two years prior to, the homicide? Appellant was greatly alarmed, and armed himself for protection. When did he arm himself? A short time before the killing, or a long time prior thereto? We are not informed on these facts. He may have been informed that the police of Dallas intended to kill him, became greatly alarmed, armed himself, and subsequently learned that he was in no danger, and become perfectly cool and deliberate. It is passing strange, indeed, that appellant, and those with whom he lived, and heard the parties inform defendant of the threats of the police of Dallas, should forget the names of his informants. If Mrs. Kirkham and E. A. Kirkham heard some persons inform appellant of the threats made by the policemen of Dallas, very slight diligence would have ascertained the names, and those persons would in all probability have been obtained. Were Mr. and Mrs. E. A. Kirkham questioned in regard to this matter? This is not shown. This application is so indefinite and wanting in specification as to render it wholly insufficient.

Matters relating to the conduct of the mob are also included in the application for continuance. The mob assembled on the day of the homicide, viz., the 17th day of June, 1892, and the trial was had on the 23d day of July—more than a month thereafter. Was the influence of the mob present, or probably present, with the jury? Can we reasonably infer that the jury was influenced by the mob? If so, appellant would have had a very strong equitable, not legal, ground for continuance. There was no attempt to show that there was improper conduct, either by word or act, from any source at the time of the trial. Again, this matter is not a ground for continuance, but for a change of venue; and, if a motion had been made to change the venue of the case, the State could have perhaps answered, and shown by proof, that in fact there was nothing to prevent a fair and impartial trial.

Over objections of defendant, the State introduced in evidence the testimony of Early, Miller, and Lamar, "in relation to the purpose of

Early and Riddle to arrest defendant, without a warrant, for carrying a pistol and raising a disturbance, upon a communication made to them after the completion of the offense, and the return of the defendant to his shop; and the statements of Miller and Conarty to Early and Riddle as to the dangerous character of the defendant, the inquiries and conversations of Early and Riddle with others and between themselves in relation to the dangerousness of the defendant, and the method and purpose of securing his arrest.''

The State's witness Early was permitted to testify, ''that on the night before the killing, witness and the deceased, Riddle, were informed by D. L. Wilson that the defendant had been carrying a pistol on his person in the street that evening, and that he was cursing and threatening to kill any damn policeman who should attempt to arrest him. The fact was communicated to Riddle and me an hour or two after its occurrence, and after defendant had returned to his shop. We determined to arrest him at that time, and with that intention went to Conarty's saloon, which was on the opposite side of the street, to reconnoiter; but the defendant's shop was dark, the lamps not being lighted, and we concluded to postpone the arrest until the next day, on Conarty's advice. Conarty said the defendant was a bad man, and that we were liable to get hurt. On the following morning at about 10 o'clock, Riddle and I came again in the same neighborhood for the purpose of arresting defendant. We first went to the neighboring barber shop, and inquired of the barber and his assistant if they had witnessed the occurrence of the evening before. They answered that they had not. We then went into George Miller's saloon, where we made similar inquiries. Riddle and Miller talked together privately, and I did not hear what was said. On Riddle's return to where I was, he said, 'All right, we will go and get him,' and we left the saloon to go to defendant's shop. As we left the saloon, I said to Riddle, ' We had better draw our pistols, so as to have an equal break with him.' Riddle said 'All right,' and took his policeman's club out of its scabbard. I I took out my pistol. On our way from the saloon to defendant's shop— a distance of seventy or eighty feet—we carried our weapons in our hands, hugging the wall, so as not to be seen by him. The defendant was not present at any of the conversations or occurrences referred to.''

The defendant objected to the evidence as a whole, and to each and every part thereof, on the ground that it was hearsay, and incompetent and irrelevant, and threw no light on the conduct and motives of the defendant in the commission of the alleged homicide; but his objection was overruled, and the evidence admitted, to which he duly excepted. These facts were clearly competent; made so by the acts and threats of the defendant. The day before the killing the defendant was on the streets with a pistol, unlawfully cursing, and swearing that he was going to kill the first officer who passed his shop. He said: '' They have been prowl-

ing around my place long enough, and have been bothering me, and I am not going to stand it any longer. I don't care if I die. I am going to shoot one or two of them before I do. I am not drunk or crazy, but mean just what I say." To Miller he stated the day before the homicide, with pistol in hand, that he was "looking for those blue-coated sons-of-bitches;" that they had been bothering him for sometime; that they did not do anything else but lie around the saloon and drink whisky, and that he wanted to kill them and kill himself. Defendant did not mention their names, but said they were "the policemen on that beat." It is evident that defendant's conduct in carrying the pistol, and deadly threats, aimed at Early and Riddle, caused them to approach defendant's shop with their arms ready for use, if necessary; and when defendant saw them approaching (if in fact he saw them approaching) with their arms ready for use, or when Early appeared in front of his door with pistol in hand, defendant had no right to apprehend unnecessary violence from either Early or Riddle. Why? Because his own conduct and threats made it imperatively necessary for these officers to be thoroughly prepared, and strictly on the qui vive. That the defendant was expecting the officers to arrest him at any moment is also evident, for he was prepared, having his pistol in a position for immediate use and prompt action.

Errors are assigned upon the charge of the court. We desire to say, that we have very carefully examined the charge in this case with reference to every phase of the case which was supported by any testimony in the record, and it is our opinion, when taken as a whole, it is a most admirable application of the law to every feature of the case. It was sufficient without the requested instructions given, but those given at the request of defendant rendered it absolutely unquestionable.

Counsel for appellant contend that the attempted arrest was unlawful: first, because it was shown that those who informed the officers that defendant had been guilty of unlawfully carrying a pistol were not credible persons; second, that defendant was not carrying the pistol at the time the officers were informed. To authorize an arrest for this offense it is not required that the offense is being committed at the time the officers are informed thereof. The law presumes a citizen to be a credible person.

Counsel for appellant contend earnestly, that the evidence does not warrant a conviction for murder in the first degree. We will discuss this question from two points of view: first, that the attempted arrest was illegal; second, that it was legal. A man will not be justified, if he kill in defense against an illegal arrest of an ordinary character, yet the law sets such a high value upon the liberty of the citizen that an attempt to arrest him unlawfully is esteemed a great provocation, such as may reduce a killing in resistance of such an arrest to manslaughter. But while this is the general rule, yet the killing may be done under such circumstances of deliberation or cruelty as will afford proof of express malice, in which

case it will be murder of the first degree (Galvin v. The State, 6 Colorado, 292; Roberts v. The State, 14 Missouri, 146), as when the killing be done with a weapon deliberately prepared beforehand to resist the illegal arrest.   Rex v. Patience, 7 Car. & P., 775.

A is expecting an attempt will be made to arrest him illegally.   He deliberately prepares his arms for immediate use, calmly and deliberately determines to kill the person who attempts the arrest.   B appears with intention of making the arrest.   A immediately shoots and kills B.   A would be guilty of murder upon express malice, though the intended arrest was illegal.   To hold A guilty of murder upon express malice would not only be law, but common sense and justice.   Applying the facts of this case to this rule of law, we would hesitate before reversing the judgment for insufficiency of the evidence, though the attempted arrest was unlawful.   But the attempted arrest was legal.   It was the duty of the officers to make it.   A failure to do so, under the facts of this case, would have made them amenable to a fine by the Penal Code, article 322.

But it is urged by counsel, that the arrest in this case was attempted in a wanton, violent, and unreasonable manner, such as reasonably created in the mind of defendant apprehension of death or serious bodily harm, and that defendant, acting upon such apprehension, would not be guilty of murder in the first degree.   If this proposition is supported by the evidence, the conclusion would be correct; for under such a state of case the accused would be justified, or would not be guilty of a higher grade of culpable homicide than manslaughter.

In support of this proposition, counsel rely:   First.   Upon the manner in which Early and Riddle approached the shop, namely, with arms prepared, and ready for immediate use.   It was the duty of these officers to arrest appellant, and we have seen that he made it absolutely necessary for them to be prepared to prevent the execution of his deadly threats to take their lives; hence the fact that the officers approached his shop with arms drawn was no ground for serious apprehension of life or body of defendant, for he could have expected nothing else but thorough preparation on their part to protect themselves against the execution of his oft-repeated threats to kill them.   Second.   Counsel assign and rely upon the fact that Early shot at appellant first, or attempted to shoot first, and this being so, we should attribute the killing to this provocation, and not to the previous malice.   This is a correct proposition, but how about the fact?   Did Early or Riddle shoot or attempt to shoot first, or make the first demonstration showing an intention to use a deadly weapon?   Upon this point Early says: "Just as I stepped up in his doorway, defendant looked up.   [He was sitting on a low chair, right in front of the door.] He was sitting on his work bench, but I could see his hand easy, and just as he saw who we were he made a dive down by his side, grabbed his pistol, and just as soon as I saw him do that I raised my pistol and pulled

the trigger, but it was only cocked half-way, and would not fire; and the next instant there was a flash in my face, and it staggered me. The flash in my face was a shot from a pistol in the hands of the defendant.''

Now, if Early tells the truth, the defendant, without any sort of doubt, was the aggressor. When he saw the officers, he '' dived. for his pistol,'' kept ready at hand, and evidently for the purpose of executing his threats to kill the first policeman who passed his door. When he reached for his pistol, Early, under the circumstances of this case, had the right to shoot him, and so had Riddle. The acts and threats of appellant made it the duty of Early and Riddle, first, to arrest Miller; second, made it absolutely necessary for them to prepare to prevent Miller from murdering them. They were in the right, Miller was in the wrong. They were performing a duty required by law, with a penalty for failure to perform it. Miller expected the arrest. He knew that he had violated the law, and would be arrested, if he did not prevent it by killing the officers. He sought and was prepared for the issue, and his preparations were made coolly and deliberately, and the issue was one of life and death; and when the crisis came he acted at once without provocation, but evidently upon his previous malice, as was expressed by his deadly threats made directly against '' that grey-headed son-of-a-bitch Riddle,'' and by other facts. We are therefore of opinion, that this was a case of calm, deliberate, premeditated murder, without one mitigating circumstance. Appellant entertained a deep-seated and malignant hatred for Early and Riddle, evinced a great desire to have an opportunity to slay them, acted in a defiant and lawless manner to induce them to attempt his arrest, coolly and deliberately prepared and had ready for immediate use his deadly weapon, was expecting the arrest, and when the issue came, without provocation, opened fire upon them, which resulted in the death of Riddle. For this homicide a jury of his county, under a full and fair exposition of the law, found him guilty of murder in the first degree, and assessed the death penalty. We have given his case a thorough investigation, such as the penalty demands, but must say that there is no such error presented in the record as would justify this court in reversing the judgment, and it is affirmed.

*Affirmed.*

Judges all present and concurring.