## P. J. FIFER v. THE STATE.

### No. 1284. Decided October 18, 1911.

### Rehearing denied January 3, 1912.

**1.—Murder—Postponement—Judgment of District Court.**

The judgments of the District Courts of this State, when not appealed from, are final, and the defendant on trial of murder was bound by the judgment against him in a civil suit in which he was defending, wherein the land was adjudged to the plaintiff, and there was no error in overruling defendant's motion for a postponement of the case for a land survey to show that he was on his own land and had a right to resist ejection.

**2.—Same—Amended Petition—Default.**

Where, upon trial of murder, it appeared that the homicide grew out of ejection proceedings against the defendant, and defendant claimed the right to resist ejection because judgment had been rendered against him for the land by default on an amended petition of the plaintiff, and the record showed that the amended petition set up no new cause of action, but simply set out the field notes. Held, that defendant was bound by the judgment of default and there was no error in overruling his motion for postponement.

**3.—Same—Judgment—Ejection.**

Where defendant was tried for murder which grew out of ejection proceedings against him, he had no right to defend his possession by force of arms, and there was no error in overruling his motion for postponement in order to have a survey of the land made to show that he was on his own land; the original judgment having decided the fact against him.

**4.—Same—Continuance—Impeachment.**

Where, upon trial of murder, a postponement was asked for impeaching testimony, there was no error in overruling same.

**5.—Same—Evidence—Bills of Exception.**

Where, upon trial of murder, the defendant objected to the questions propounded by State's counsel because the answers would have been conclusions of the witness, etc., but did not set out enough of the testimony in his bill of exceptions to enable the court to pass on the question of admissibility of the testimony, the matter could not be reviewed; besides, the objection would only go to the weight of the testimony.

**6.—Same—Evidence—Court Records—Civil Suit—Motive.**

Where the defendant claimed that he was the owner of the land about which the homicide occurred which grew out of ejection proceedings, there was no error in admitting in evidence the record in a civil case which disclosed that defendant had been sued for said land and judgment rendered against him, and that he had been enjoined from entering thereon and had disobeyed said injunction, etc., in order to show motive and malice, the testimony being properly limited thereto; besides, the bill of exceptions was defective in not setting out the instruments to which objection was made.

**7.—Same—Evidence—Assignments of Error.**

Assignments of error in the transcript will not be considered; the Appellate Court can only look to the motion for new trial.

**8.—Same—Evidence—Threats—Writ of Possession.**

Upon trial of murder, there was no error in permitting the State's witness to testify that a writ of possession was issued out of the District Court against the defendant to dispossess him of the land about which the homicide occurred, and that defendant threatened to kill the man who attempted to put him off the land, and that he resisted the civil process of the court, etc.

**9.—Same—Evidence—Malice.**

Where, upon trial of murder, defendant contended that he claimed the land in good faith about which the homicide occurred, there was no error to show that at the time defendant was dispossessed the officer took the decree of the court, and in the presence of defendant ran the lines of the land and put defendant and his property off the land; to show that he had notice of the decree.

**10.—Same—Evidence—Execution.**

Where defendant contended that the deceased was a trespasser at the time defendant killed him, there was no error in permitting the State to show that the deceased, who was a deputy sheriff, had an execution in his pocket at the time, against the defendant.

**11.—Verdict—Reforming Verdict.**

Upon trial of murder there was no error in the court's action to change the form of the verdict before it was filed, in the presence and by the assent of the jury.

**12.—Same—Argument of Counsel.**

Where the argument of State's counsel was a legitimate deduction from the evidence, there was no error.

**13.—Same—Charge of Court—Practice on Appeal.**

Where the objection to the charge of the court pointed out no error, the same can not be considered on appeal.

**14.—Same—Charge of Court—Special Charge.**

Where the motion for new trial did not point out the error as to the failure of the court to submit defendant's special instructions, the matter can not be reviewed; besides, the court's main charge covered the issues submitted.

**15.—Same—Uncommunicated Threats.**

Where, upon trial of murder, there was no evidence that deceased had made any threats, there was no error in the court's failure to charge on uncommunicated threats.

**16.—Same—Charge of Court—Self-Defense—More Than One Assailant.**

Where, upon trial of murder, the evidence showed that the deceased and another were officers and had gone to defendant's place for the purpose of serving some papers in a civil suit, out of which the homicide arose, and there was no evidence that the party accompanying the deceased said or did anything at which anyone could take offense, but merely showed his presence at the scene of the homicide and no more, and the court in charging upon self-defense limited defendant's right thereto to the acts of the deceased, and did not submit the acts and conduct of his said companion, there was no reversible error. Davidson, Presiding Judge, dissenting.

**17.—Same—Charge of Court—Manslaughter.**

Where, upon trial of murder, the evidence showed that the defendant was in hiding at the time he shot deceased, who was an officer attempting with another officer to serve some papers in a civil suit upon the defendant, and defendant's testimony did not show such a state of anger, rage or terror as to render him incapable of cool reflection, but that he acted coolly and deliberately when he fired the shot, there was no error in the court's failure to charge on manslaughter. Davidson, Presiding Judge, dissenting.

**18.—Same—Newly Discovered Evidence.**

Where the facts alleged to be newly discovered testimony did not authorize a reversal of the case, there was no error.

**19.—Same—Practice on Appeal.**

Where the alleged error is such that it could not have operated injuriously to defendant, there is no reversible error; and where the court fully and fairly submitted the law of self-defense as applicable to the facts, and there was no

manslaughter in the case, and defendant was convicted of murder in the first degree, there was no error in the court's failure to submit manslaughter. David-son, Presiding Judge, dissenting.

Appeal from the District Court of Lipscomb. Tried below before the Hon. F. P. Greever.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*J. W. Saunder, Adkins & Sewell* and *Willis & Willis,* for appellant. —On question of admitting conclusions of witness as to the direction of the shot: Hunt v. State, 9 Texas Crim. App., 166; Pharr v. State, 9 Texas Crim. App., 129; Thompson v. State, 30 Texas Crim. App., 325.

As to question of admitting writ of sequestration: Wilkins v. Weller, 1 App. C. C., sec. 89; Fowler v. Stonum, 6 Texas, 60.

On question of limiting defendant's right of self-defense to the acts of deceased. Stacy v. State, 48 Texas Crim. Rep., 95; Meuly v. State, 26 Texas Crim. App., 274; Roberts v. State, 30 Texas Crim. App., 291; Jones v. State, 20 Texas Crim. App., 665; Bean v. State, 25 Texas Crim. App., 346; Francis v. State, 55 S. W. Rep., 488; Seeley v. State, 63 S. W. Rep., 309.

On question of self-defense: Tillery v. State, 24 Texas Crim. App., 251; Brittain v. State, 47 Texas Crim. Rep., 597;; Nelson v. State, 48 Texas Crim. Rep., 274; Arnwine v. State, 50 Texas Crim. Rep., 254; Roberts v. State, 48 Texas Crim. Rep., 378; Scott v. State, 46 Texas Crim. Rep., 305.

On the question of the court's failure to instruct on manslaughter: Williams v. State, 7 Texas Crim. App., 396; Nayland v. State, 13 Texas Crim. App., 526; Rutherford v. State, 16 Texas Crim. App., 649; Hjeronymous v. State, 47 Texas Crim. Rep., 366; Pryse v. State, 54 Texas Crim. Rep., 523; Gant v. State, 55 Texas Crim. Rep.. 284; Yancey v. State, 48 Texas Crim. Rep., 166; Arnwine v. State, 49 Texas Crim. Rep., 5; Vann v. State, 45 Texas Crim. Rep., 434.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was indicted by the grand jury of Hansford County, charged with the murder of Sheriff Martin. The venue was changed, and the cause was tried in Lipscomb County. Appellant was adjudged guilty of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life.

There are a number of bills of exception and assignments of error in the record, and that our ruling thereon may be better understood, it may not be amiss to give a brief outline of the case as presented by the record. It appears that appellant claimed and was residing on a tract of land in Hansford County; that G. W. Norton, executor of the

estate of Geo. W. Norton, also claimed this tract of land. Norton brought suit against appellant to try the title to this tract of land in the District Court of Hansford County in 1908, and appellant was served with citation by B. O. Cator, who was then sheriff of that county, and who also levied a writ of sequestration on the land in question and notified appellant he had ten days in which to replevy it, otherwise he would be compelled to put him off of the land. At that time, according to the testimony of ex-Sheriff Cator, the following conversation took place: When the sheriff informed him that he had papers to dispossess him, appellant said: "God damn you, I have taken all I am going to take from you." When the sheriff replied: "I didn't come here to fight, I came here to talk," appellant replied: "God damn you, you would sooner see your box than put me off of here, and he would kill any s—n-of-a-b—h that attempted to put him off." The sheriff told him he would give him ten days to replevy and if he did not do so he would return and put him off. Appellant did not replevy the land, and the sheriff sent his deputy, Martin, the deceased, and Bowling, a special deputy, to execute the writ and dispossess appellant. Bowling says: "When we got there, Martin called appellant, and appellant began cursing, saying: 'Martin, I said I was going to kill the first man that undertook to put me off this land, and I have not taken it back,' and if he (Martin) was hunting for trouble, he was ready for it. Martin at once arrested him, and went in the house, and secured possession of appellant's gun, keeping him under arrest while moving his property off the land." Subsequently, appellant moved back on the land in question.

At the next term of court, appellant did not appear, and judgment by default was rendered against him, adjudging the land to be Norton's. A writ of possession was issued, but which appellant did not respect. Norton then brought suit to enjoin appellant from going on the land adjudged to him in the suit, but appellant, although served, ignored the injunction. Affidavit was then made that he had disobeyed the injunction, and appellant was adjudged guilty of contempt, and sentenced to jail. After being confined in jail for some time, he signed an agreement not to go on the land, unless the courts should finally adjudge him to be the owner, when he was released. In violation of the orders of court and his agreement, he at once returned to the land, and took possession thereof.. Norton then brought suit in Federal Court and sued out a writ of sequestration. A deputy marshal served him with a citation, and levied the writ, informing the appellant he had ten days in which to replevy and hold the land, and if he did not do so, he, the marshal, would be compelled to eject him therefrom. Appellant did not replevy, and after the lapse of time plaintiff, Norton, replevied the land, and when he did so, Bolton, the deputy marshal, and Sheriff Martin, deceased, went to the land to inform appellant and put Norton in possession. They went to the house in day time, but did not find appellant. They returned shortly after dark, seeing a

light in the house. Bolton had the writ of sequestration, replevy bond and bond of indemnity with him. Martin had an execution for costs against appellant issued out of the District Court. This much may be said to be uncontroverted.

The State's testimony showed that when Bolton and Martin started to the house, the light went out, and appellant came out running towards the barn, when Martin, while within forty or fifty yards of appellant, called to him: "Hold on, Phil, this is Martin," repeating it. When appellant did not stop, Martin fired. Appellant kept running until he got to the barn, a distance of about 150 yards. Bolton and Martin then went to the barn and called appellant, Martin telling him who he was, and that he wanted to see him. No response was made. Deceased Martin and Bolton then started to return to the house, but after going a part of the way, decided to return to the barn and search for appellant. When they got to one stall, Martin struck a match and remarked, "This is Phil's (appellant's) horse," but not seeing appellant, he went to the next stall, and asked Bolton for a match to look in it. As he struck the match, a gun fired, killing him. The muzzle was so close as to burn the fuzz on his garments. Bolton left, going in search of assistance. Johnson testified that appellant came to his house the night of the killing about 11:30, and told him he wanted to give himself up; that he had killed a man. Said he had killed Martin; that it was Martin's voice. A witness testified that he was on appellant's place the day before the killing, and when appellant saw him coming, appellant went to his barn and got a gun, and left and went into a nearby dugout. That he could detect appellant watching; that appellant did not return to the house, and he left.

Appellant testified for himself and denied the conversations testified to by ex-Sheriff Cator, and Special Deputy Bowling. He also denied the conversation with witness, Johnson, and testified he did not know who it was when he shot and killed him, but he did hear Bolton say after the shot was fired, he had killed Martin. He explained that the day before he was duck hunting, and had gone by to feed his stock, when the witness saw him get the gun at the barn. He returned home from a brief trip to town the day of the killing, and in coming by the barn, left his gun down there. He did not know Bolton and Martin were near until he had blown out the light and started in a walk to return to the barn to feed. He was not running; heard some one say, "Hold-up," but heard no more, and then two shots were fired at him, and he run to the barn. The two men followed him to the barn; he did not know who they were, nor their purpose. He concealed himself in the stall, the adjoining one in which he had placed his horse. He did not fire until Martin started to come into the stall in which he was located, and not knowing who it was, nor his purpose, he shot. When Bolton left, he turned his cows into the pasture, got his horse and left, going first to Thronson's and then to Johnson's. On cross-examination, he admitted that he knew judgment had been obtained

against him for the land, but said attorneys said they could have it set aside as it was taken on an amended petition; that he had been enjoined, and fined and imprisoned for violating the injunction, and had signed a written agreement not to go on the land, and had ignored the injunction and agreement.

1.   Appellant complains of the action of the court in overruling his motion for a postponement of the case, in which he alleged that he desired to have the land surveyed, to show that he was not on Norton's land, but was in fact on his own land, and had a right to resist being ejected therefrom. The judgments of the District Courts of this State, when not appealed from, are final, and when in a suit between Norton and appellant, the land was adjudged to belong to Norton, appellant was bound thereby. It is true, he now contends that the judgment was void, because rendered by default on an amended petition. By examination of the original petition and the amended petition, we find that no new cause of action was set up in the amended petition. In the original petition, plaintiff, Norton, sued in trespass to try title and for damages, for a section of land, alleging it to be "section number 135, certificate number 33/455, abstract number 68, G. H. & H. R. R. Co. surveys, Hansford County, Texas." In the amended petition, the land was thus again described, but in addition thereto, the field notes were set out as well. This is the only thing added by way of amendment. In Railway v. Morris et al., 68 Texas, 60, our Supreme Court says: "Where, after issuance and service of citation, amended petition was filed containing same allegations regarding damages, but more specific, and no new cause of action was alleged, held no notice of filing amendment necessary to enter default." In this case no new cause of action was set up; the original petition sufficiently described the land to have proceeded to judgment, and the fact that by amendment the field notes were added thereto, would not render the judgment by default void. Appellant can not be permitted to say he had a right to defend his possession by force of arms, especially so as subsequent to the rendition of this judgment he was informed that his contention had been adjudged against him by a court of competent jurisdiction, had been arrested and imprisoned for contemptuously ignoring the court's orders in regard thereto, and in order to get released from jail, had signed an agreement to remain off the land. No man has a right to take his shotgun and set himself up in defiance of the courts of his country, nor claim, after they had adjudicated the question, that because he thought the courts were wrong, he would ignore the decrees, and forcibly retain possession of property, that had been adjudged did not belong to him. This is a country of law and order, and the day is passed, if it ever existed, when a man can set at naught the decrees of a court, and defy the legally constituted authorities. Appellant can not, in this case, base any defense on a right to defend his possession of the land in question, and the court did not err in overruling the application on this ground. Neither did the court err in overruling the application on the

ground of the absence of the witness, Armstrong. All he states he expects to prove by this witness, was that this witness would testify that he had heard the witness, Bolton, say that two shots were fired. Bolton testified only one shot was fired, and if the absent witness would testify as alleged, it would only be admissible to impeach the witness, Bolton, and a continuance or postponement will not be granted to obtain impeaching testimony. Garrett v. State, 37 Texas Crim. Rep., 198; Rodgers v. State, 36 Texas Crim. Rep., 563; Butts v. State, 35 Texas Crim. Rep., 364; Franklin v. State, 34 Texas Crim. Rep., 203; Bolton v. State, 43 S. W. Rep., 1010.

2. In the second bill of exception appellant complains State's counsel propounded to Bolton the following question: "Can you state to the jury from the report of the gun and the position you occupied between Mr. Martin and Mr. Fifer, the direction Martin fired the gun?" "To which the defendant objected because such was not a proper subject of expert testimony, was a conclusion of the witness, and if it could possibly be a proper subject of expert testimony, then no predicate was laid for its introduction. Which objections were, by the court, overruled, and said witness permitted to testify in the presence and hearing of the jury that he could tell the direction said Martin fired the gun, and in substance, that said shot was not fired in the direction of Fifer." Not enough of the testimony is set out in the bill to enable the court to pass intelligently on the question of the admissibility of this testimony. A bill should always be so full and complete, that, without referring to the other parts of the record, the court would be enabled to pass on the question from the bill alone. Insofar as this bill is concerned, the court might infer that Bolton was looking direct at Martin, or any other state of facts which would enable Bolton to testify positively from personal knowledge. McGlasson v. State, 38 Texas Crim. Rep., 351; Attaway v. State, 31 Texas Crim. Rep., 475; Davis v. State, 14 Texas Crim. App., 645, and authorities cited in section 857 of White's Annotated Code of Criminal Procedure. But if we turn to the statement of facts and read the witness' entire testimony, the objection would go to the weight of the testimony and not to its admissibility. In bill No. 3, the same matter is presented in a different form, and the bill is subject to the same objections.

3. In bills of exception Nos. 4, 5, 6, 12, 13, 14, 15, 16, 17, 18 and 19, appellant reserved exceptions to the introduction of (1) the original petition in suit of Norton v. appellant; (2) the amended original petition in said suit; (3) the judgment of the court; (4) the writ of possession issued on said judgment; (5) the petition for injunction; (6) the affidavit alleging violation of the injunction; (7) the judgment adjudging him guilty of contempt of court; (8) the writ of sequestration issued out of the Federal Court; (9) bond for writ of sequestration; (10) indemnity bond; and (11) an execution for costs issued

out of the District Court of Hansford County, found in deceased's possession. As illustrative of the bills, one recites:

"Be it remembered that upon the trial of the above entitled and numbered cause, State's counsel offered in evidence the original petition in the suit of G. W. Norton, executor, v. P. P. Fifer, in the District Court of Hansford County, Texas, same being a suit in trespass to try title, presumably affecting the premises where the homicide occurred. To the introduction of which defendant objected because the same was a civil suit, irrelevant and immaterial to the issues in this cause; was calculated to prejudice the jury by causing them to believe that defendant was a trespasser upon certain land. Which objections were, by the court, overruled and said original petition permitted to be read in evidence to the jury.

"To which ruling and action of the court defendant then and there in open court excepted, and now here tenders this his bill of exceptions and asks that the same be examined, signed and approved and ordered to be filed as a part of the record in this cause, which is accordingly done."

In none of these bills are the instruments to which objection was made set out in the bills, nor is the substance of the instrument. The recitation is that a certain instrument was introduced in evidence, and then the grounds of objection to its introduction. If there could be any state of facts upon which these instruments would be admissible, the court must so infer. As hereinbefore stated, bills of exception must be complete in themselves. An unbroken line of authorities in this court hold that to have the trial court reviewed on appeal in admitting or rejecting testimony, the bill must present the matter in so complete a manner that the court, from an inspection of the bill, without reference to other portions of the record, can act on it. The recitations of the bill that it was "irrelevant and immaterial" are too general, and that it was "calculated to prejudice the jury by causing them to believe the defendant was a trespasser upon certain lands," can not be passed upon without an inspection of the instrument, and the instrument not being in the bill, we would have to turn to the statement of facts to find it. Tweedle v. State, 29 Texas Crim. App., 585; Quintana v. State, 29 Texas Crim. App., 401; Hooper v. State, 29 Texas Crim. App., 614; Wilkinson v. State, 31 Texas Crim. Rep., 86; Ballinger v. State, 11 Texas Crim. App., 323; Moorty v. State, 35 Texas Crim. Rep., 450. For a discussion of bills of exception, see Patterson v. State, and Conger v. State, decided at this term of court, and authorities cited. But should we consider these bills, it would be difficult to conceive wherein they were prejudicial to defendant. As will be seen, in the motion for a postponement in the beginning of the trial, he tendered the issue that he was in fact the owner of the land, and had a right to defend his possession. In his testimony, he tendered the issue that he was the owner of the land in question, and was claiming it in good faith, two of the special charges requested by appellant raise this

issue, and under the circumstances, we think it was a material issue to prove that appellant had been sued for the land, that it had been decided that he was not the owner of it, and had been enjoined from entering thereon; had signed an agreement not to go on the land, all to show that his claim was not in good faith, and which facts and circumstances, taken together with the testimony of Cator and Bowling, show a determination to hold the land, in spite of the law, and hold even if he had to take life to do so. It all, in the light of this testimony, tended strongly to show the state of mind of appellant, and the motive actuating him on the night of the killing, and we do not think a reversible error was committed in admitting these papers, especially so when the court instructed the jury: "In connection with the documentary evidence, consisting of various court papers, introduced in evidence, you are instructed that you can consider same only, if at all, in connection with the issues of motive and malice, and for no other purpose, and you can not consider any statement, if any, in such papers with reference to the character of the defendant for any purpose in this case." As before stated, if the bills were full and complete, when thus limited by the court, taking into consideration the contention of appellant as manifested by the record, we do not think any reversible error was committed by the court. By turning to the statement of facts and reading them, there are two, perhaps, the portion of them speaking of appellant and his disposition, should not have been admitted, but the bills presenting these do not copy them in the bills, and to learn what was in them, we were compelled to refer to the statement of facts. However, the court instructed the jury not to consider these paragraphs, and none of the papers except insofar as they might tend to show motive or malice.

4. Neither can we consider the assignments of error in the transcript. This court has held that we can only look to the motion for a new trial, and consider such questions as there raised.

5. There was no error in permitting the witness to state that the writ of possession, on which appellant was ejected, was issued out of the District Court of Hansford County. Neither was there error in the court permitting the witnesses, Cator and Bowling, to testify to threats made by defendant at the time he was notified the land was levied on, and at the time he was moved off the land. He then said he would kill the man who put him off; had to be arrested and held while his things were put off; and moved back on the land despite the judgment of the court. All this tended strongly to show the spirit actuating defendant and his motive, if the State's theory was believed by the jury.

6. In the light of the contention that appellant was still claiming the land in good faith, there was no error in permitting it to be shown that at the time defendant was dispossessed, the officer took the decree of the court, and in the presence of appellant, run the lines of the land, and appellant and his property were placed off the land. This

showed conclusively that appellant knew that a decree of court had been rendered decreeing him not the owner of the land. He made no effort to have this decree set aside, but undertook to hold it in the manner he had informed Cator and said in the presence of Bowling to Martin, deceased.

7. It was not error to permit the execution found in deceased Martin's pocket to be introduced in evidence. Appellant was contending that Martin was a trespasser, and this paper was evidence that Martin had a right to go on the premises to see appellant. Of course, no one contends that it gave him the right to shoot at appellant, or even fire his pistol, but this and the writ of sequestration show that both officers had gone on the premises in the discharge of their duties.

8. Appellant also complains of the action of the court in reforming the verdict of the jury. The verdict read: "We, the jury, find the defendant, P. P. Fifer, guilty of murder in the first degree, and fix his sentence to be life imprisonment." The court changed the verdict to read: "We, the jury, find the defendant guilty of murder in the first degree and fix his punishment to be life imprisonment in the penitentiary." In approving the bill the court says: "The change in the form of the verdict was made by me before it was filed, and in the presence of the jury, to which change they assented." This presents no error.

9. The appellant also complains of the remarks of counsel for the State. It is asserted that H. E. Hoover said: "About that time, defendant was seen riding around with a gun. It is true he explained it, but, gentlemen, they always explain it." Appellant insists that this was very prejudicial. It was but the argument advanced by counsel, and we can not say it was improper.

10. Again appellant contends that the argument of R. E. Taylor was improper and hurtful. Taylor said: "After the defendant had been punished for contempt and placed in the jail at Canadian, he signed a written agreement, if they would let him out of jail he would purge himself of the contempt he had been guilty of and not go back on that land; that he left the jail at Canadian and went through a portion of Hemphill County, and I assume across Ochiltree County into Hansford County, and perched himself on this same identical land; he remained there according to his own testimony and remained on this land until he had killed poor Martin and was taken off from there by reason of the fact, and if you return a verdict of not guilty in this case and permit him to go free, he will return again there and remain there until he will kill another good sheriff." All this is but a recitation of the evidence, except the latter clause wherein he said: "If you return a verdict of not guilty in this case and permit him to go free, he will return again there and remain there until he will kill another good sheriff." This, we think, was a deduction drawn by counsel from the evidence, and if we say they can not state deductions in their argument with evidence upon which to base the remarks, it would narrow

State's counsel to such a point it would be dangerous for them to speak for fear of a reversal.

11. We can not consider paragraphs 39 to 57, inclusive, of the motion for a new trial. They read: "Because the court erred in giving in charge to the jury, paragraph number one of his general charge," and so stating a different number in such paragraph. This states no ground of objection, points out no error, and is too general to be considered. In the paragraphs following, each paragraph of the charge is thus referred to, and none attempt to point out wherein the court erred.

12. Again in paragraphs Nos. 20 to 38, inclusive, it is only alleged: "Because the court erred in refusing to give in charge to the jury defendant's special requested charge No. 1," and each succeeding number complaint is made in the same way of a different special charge requested numbered from 1 to 19. The appellant thus does not give the trial court a chance to consider the matter properly. In the motion for a new trial, the error should be pointed out, and if it is a failure to give a special charge, some reason or facts stated wherein it was applicable to the case. However, we have read the special charges as well as the charge, and the court's main charge covers those applicable to the facts in evidence. In a number of them there was no evidence on which to base them.

13. There was no evidence to call for a charge on uncommunicated threats. There was no evidence that deceased, Martin, had made any threat at any time.

14. The appellant, in a number of paragraphs in the motion, complains of the action of the court in limiting defendant's right of self-defense to the acts of R. E. Martin alone, and in not submitting the acts and conduct of L. J. Bolton as well as those of Martin. No complaint is made of the charge on self-defense as applied to the acts and conduct of Martin, only that defendant had the right to act from the conduct of Bolton as well, and if Bolton did anything, the contention should be sustained. We have read and reread the evidence of Bolton and defendant. They were the only living persons present at the time the fatal shot was fired. Bolton was with Martin at the place. The evidence shows that Martin fired a shot, that Bolton and Martin went to the barn together; that Martin struck the matches, and called defendant. Bolton is not, either by the evidence of himself or of defendant, shown to have fired a pistol, drawn a gun, or said anything at which anyone could take offense, and the evidence merely showing his presence, and no more, we do not think the court erred in the matter.

15. Neither do we think the facts called for a charge on manslaughter. It is true a shot was fired, and defendant says he heard it singing close to him; that he run to the barn and was followed down to the barn. But it appears that he was called by Martin by his given name, saying, "Phil, I want to see you." Fifteen minutes elapsed after the shot was fired before Martin was killed. Appellant was in hiding, and

does not testify to such a state of anger, rage or terror as to render him incapable of cool reflection. In fact, his conduct, according to his testimony, would indicate coolness and deliberation, for as soon as he fired the shot, he watched Bolton leave, turned out his stock, went to the house, changed his coat, and rode over to a neighbor's.

16. Neither do we think the facts alleged to be newly discovered testimony would authorize a reversal of this case. The fact that Martin and Bolton had that evening shot at a target (a fact he did not know at the time of the killing) could not and would not be a defense. Nor the fact that Martin's pistol was out of repair, and he borrowed one from Bolton. Appellant does not testify that Martin had a pistol or was seeking to use it at the time he was shot. He attempts to justify his conduct on the ground that these men came on his place; that he did not know who they were, and one fired a shot or two shots, as he was on his way to the barn. After getting to the barn, he was followed, and thought his life was in danger, and killed the man just as he was about to be discovered. The court submits this theory to the jury, and instructs them to acquit the defendant if the evidence does not show the falsity of it. Under the evidence, the jury would be authorized to find that defendant knew it was Sheriff Martin, and heard Martin tell him it was him, calling him by name, saying: "Wait Phil, I want to see you." That he kept his gun in the barn, and run there to it, and when he got there, waited until the sheriff was about to find him, and then killed the sheriff because he believed he had come to again move him off the land, thus executing the threat he had made to ex-Sheriff Cator when first served with a citation.

We do not think there is any such error in the record, after carefully reviewing it, as would justify a reversal, and the judgment of the trial court is affirmed.

*Affirmed.*

Davidson, Presiding Judge, absent.

### ON REHEARING.

#### January 3, 1912.

HARPER, Judge.—At a former day of this term, this case was affirmed, and appellant's counsel have filed a motion for rehearing, complaining of paragraphs fourteen and fifteen in the original opinion, and earnestly insists that the evidence called for a charge on self-defense applied to both Martin and Bolton, and that the court erred in not submitting the issue of manslaughter. We have reread the lengthy statement of facts with care and consideration, and while the numerous authorities cited by appellant correctly state the law, yet none of them apply to the facts in this case, as we read the statement. It is true that in determining whether an issue should have been submitted favorably to defendant, we must take the testimony of the defendant, and if it raised the issue, the fact that the trial court or this court do not

believe it, is immaterial; if it is an issue of fact, he has the right to have the jury pass thereon, but the law in this State has been announced in many cases that if the error, if error there be, be such that it could not have operated injuriously to defendant, this court will not reverse the case. So in this case, if the court erred in the two respects named, under .the verdict in this case, finding that defendant killed with express malice, when the issue of murder in the second degree was submitted, and that in so doing, he was not acting in self-defense from the acts and conduct of Martin, the only person that the entire record shows was doing any act, it can not be said that the failure of the court to submit self-defense from the acts and conduct of Bolton (whom the entire evidence shows did nothing), as well as that of Martin, would be ground for reversal. The court fully and fairly submitted every theory of self-defense as applied to the conduct of Martin, and if the jury found adversely to appellant under this charge, as they did, it could not be supposed for one moment, that their verdict would have been different if he had included the acts of Bolton with that of Martin, as the evidence of defendant only shows that the two were together, and his testimony, in the light of all the evidence, does not indicate that but one person, from his standpoint, was guilty of any conduct that would authorize him to act in self-defense, and this is shown to have been Martin, and this being fully and fairly submitted to the jury, there was no such error as should work a reversal.

Again, the court submitted murder in the first and second degree, and the jury finds defendant guilty of murder in the first degree. Can it be said that the court failing to submit a less degree of homicide was harmful, when they have found him guilty of the highest degree that was submitted? We hardly think so. But, we are still of the opinion that the evidence does not raise the issue of manslaughter. While, it is true, if you take isolated parts of defendant's testimony, he would at times use expressions that he was excited, etc., that would aid to raise this issue, yet when one takes his evidence as a whole, the testimony of defendant shows calmness, deliberation and a fixedness of purpose, and that his whole acts and conduct are based upon a pre-existing determination not to surrender the land in question. The evidence would show that the officers went to defendant's home in the day time; he was absent. They went to a neighbor's and remained until he returned. They then started to his house, when the light was put out, and appellant came out and started to his barn where he had left his gun. He was called and told they wanted to speak to him. The officer says that Martin said: "Hold on, Phil, I want to speak to you—this is Martin." Appellant admits he heard them say, "Hold on, Phil, I want to speak to you," but denies hearing him say it was Martin. But what he admits he heard is enough to convince anyone that appellant must have known it was some of his acquaintances by the fact he admits that he heard them call by his given name, "Phil."

He did not stop, but ran to the barn where he had left his gun, and gets in a darkened stall. When he did not stop, although called by his given name, one or two shots were fired; appellant says this excited him. When he ran to the barn, Bolton and Martin went down there. Was there anything said or done down at the barn to excite anyone, make them angry, or frighten them? The witness says: "I thought he went into the feed lot, and I turned and went through the feed lot and did not find him. I said, 'Mr. Fifer, Mr. Fifer, this is the deputy United States marshal; I want to see you about five minutes; want to talk to you.' I did not get any response and I opened the gate and went in on the south side of the stall. I went in and there was a manger here. I called to him again and said, 'This is the deputy United States marshal; I want to see you and talk with you about five minutes;' he made no reply. Mr. Martin was standing south of the first stall where Mr. Fifer's horse was eating, some five or ten feet from me. I was some eighteen feet south from the stall where the horse was in. Mr. Martin was standing right close to that stall. . . . I would not assume it was over five minutes, I suppose, after we got to the barn before we left the barn the first time. We went back out of the corral and started to walk up towards the house. Mr. Martin was with me. Before we left the barn and started towards the house, we had not been able to get any response from Mr. Fifer. When we left the barn and started toward the house, we went about half way to the house. We stopped there. We stayed there standing about only two or three minutes, and then we went back down to the barn. Our object in going back to the barn was Mr. Martin said 'He's down there, I can find him.' I said, 'I will tell you sheriff, it's a little dangerous proposition to go down there, he can see us and we can not see him; I think it advisable to go up to the house and wait until he comes up.' We went back to the barn. We went back and Mr. Martin struck a match and looked in where the horse was in the stable and said, 'This is Phil's horse all right.' I was standing right by him when Mr. Martin opened the door and struck the match and said, 'This is Phil's horse all right.' When we got down to the next stall, Mr. Martin walked up to the door a little east of the center of the door; as we walked up, Mr. Martin said, 'Have you a match?' I said, 'Yes, here's one,' and I run my finger in my pocket and the gun was fired. The place where Mr. Martin struck the match was some sixteen or eighteen feet from the stall where the gun was fired."

Here are the men within a few feet of where appellant admits he was in hiding, letting him know their business and that they wanted to see him and talk with him, and when they see his horse, saying, "This is Phil's horse." Anything said to alarm anyone? We think not. Appellant admits he heard them say, "That is Phil's horse," which would further carry home to him that they were acquaintances, if not the personnel of the men. He does not say they said a word or did a thing that alarmed or excited him, except firing the shot or shots some fifteen

minutes before. His coolness and deliberation are manifest by what he says he did, as quoted in the original opinion. That he knew who it was is manifest by the testimony of Mr. Johnson, who says that after the killing, appellant came to his house, and told him he had killed Martin, and when asked if he was not mistaken, replied, "It was Martin's voice." The fact that these two men were officers, on a lawful mission, does not render it any less a crime to kill them than if they had been private citizens, and no one would contend that if two citizens should go to a neighbor's house and call him by his given name, and when he went to his barn, to go there and call him, and if the business was urgent, to strike a match to look for him, would give.one a right to kill them or either of them without asking who they were or inquiring about their business, nor would such circumstances render the mind incapable of cool reflection. When one calls another by a given name and tells him he wants to see him, as appellant admits he heard these men do, before he would be authorized to kill, the law would require some overt act on their part or some inquiry on the part of the slayer. The whole record bristles with facts that appellant was but carrying out his preannounced threats, as fully set forth in the original opinion, and there is no fact or circumstance that would reduce the homicide to manslaughter, in our opinion.

On the issue of self-defense, the evidence showing that it was Martin who fired the pistol; that it was Martin who struck the matches; that it was Martin who was approaching the stall, the jury could not have been misled by the omission of Bolton's name, when the court charged the jury: "The defendant enters a plea of not guilty, and also relies for an acquittal on the ground of justifiable homicide, and on this branch of the case you are instructed: A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to defend his life or his person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him, from his standpoint at the time, and in such case the party acting under such real or apparent danger, is in no event bound to retreat in order to avoid the necessity of killing his assailant. The questions for your determination are: Was the defendant in present danger or apparent danger? Was the homicide committed in a bona fide effort to preserve himself from impending danger or apparent danger to his life, or to prevent serious bodily injury to himself?

"It is not essential to the right of self-defense that the danger should in fact exist. It may be only apparent and not real. If it reasonably appears from the circumstances of the case that danger existed, the person threatened with such apparent danger has the same right to defend against it and to the same extent that he would were the danger real. And in determining whether or not there was reason to believe that danger did exist, the appearances must be viewed from the standpoint of the person acting on them, and from no other standpoint.

"Now, if you shall find and believe from the evidence that the defendant shot and killed R. E. Martin, but further believe that at the time of so doing, the acts and conduct of the deceased toward the defendant were such as to indicate a present purpose on the part of the deceased to take the life of the defendant or of doing him serious bodily injury, or if from the acts or conduct of the deceased at the time, it reasonably appeared to the defendant that he was in such danger, and that it was then imminent and pressing, viewing the matter from the standpoint of the defendant alone, and that under such circumstances, defendant shot and killed R. E. Martin, he would be justified in. so doing, and in the event you so find, you should acquit the defendant, or if you have a reasonable doubt, under the foregoing instructions, as to whether or not the defendant was justifiable in killing the deceased, then you will acquit him."

This presented every theory of the defendant's defense in the light of the evidence, and they were instructd that the "appearance must be viewed from the standpoint of the person acting on them, and from no other standpoint." The criticism that the court erred in not including Bolton's name under the evidence in this case is hypercritical and the issues made by defendant's testimony is fairly and fully submitted. By no possible construction of this language could the jury have been misled.

The motion for a rehearing is overruled.

*Overruled.*

DAVIDSON, PRESIDING JUDGE, (dissenting).—When the original opinion was delivered, I was absent and did not participate either in the consultation with or in the conclusions reached by my brethren. The case was submitted again upon motion for rehearing, upon brief and oral argument. I have reviewed the case and the conclusions as stated by my brethren, and am wholly unable to agree with the affirmance, or their conclusions on questions decided.

There are quite a number of questions in the case in regard to the admission of testimony some of which clearly show reversible error. In the attitude, however, in which the case is presented on rehearing, I shall confine myself particularly to the failure of the court to give a proper charge on self-defense and a refusal to charge on manslaughter. Exceptions were duly taken to these matters in the trial court.

There is, to some extent, a slight divergence in the testimony developed on the trial for the State and the defendant. Some of the main facts are not only not controverted, but testified by both parties. There were two eye-witnesses to the transaction, L. J. Bolton and appellant. Bolton testified that he and deceased, Martin, went to appellant's home at night; they got off their horses, crossed appellant's fence about a hundred yards from his residence, and on the north side of his residence. When they got to the fence north of the house, he saw a light in the house, and after he and deceased, Martin, had crossed

the fence and had gone a few steps, the light went out. They were then about fifty yards from the house. The next thing they saw was appellant running from the house towards his barn. He did not see appellant when he came out of the door of his house. Appellant had gotten about a couple of steps from the house when the witness first saw him. The first thing said was by Mr. Martin, who called to appellant and said, "Hold on, Phil, I want to see you, it is Martin." They were then not over fifty yards from appellant. Appellant paid no attention to this, but kept on running. He said Martin again called to him and said he wanted to see him, and repeated this the third time. Appellant "did not slow down any when Martin made these calls. The next thing I heard was Mr. Martin fired a gun. I suppose I was eight or ten steps in front of Martin, between him and Fifer, when Mr. Martin fired this gun. There was only one shot fired there. I saw Mr. Fifer when the shot was fired, he was running then; he had not slowed any from the time he left the house until the shot was fired; then he turned and I thought he went into the feed lot, and I turned and went through the feed lot and did not find him. I said, 'Mr. Fifer, this is the deputy United States marshal; I want to see you about five minutes; want to talk to you.' I did not get any response, and I opened the gate and went in on the south side of the stall. . I called to him again and said, 'This is the deputy United States marshal; I want to see you and talk with you about five minutes;' he made no reply. Mr. Martin was standing south of the first stall where Mr. Fifer's horse was eating, some five or ten feet from me. I was some eighteen feet south from the stall where the horse was. Mr. Martin was standing right close to that stall. I would not assume it was over five minutes, I suppose, after we got to the barn before we left the barn the first time. We went back out of the corral and started to walk up towards the house. Mr. Martin was with me. Before we left the barn and started towards the house, we had not been able to get any response from Mr. Fifer. When we left the barn and started toward the house, we went about half way to the house. We stopped there. We stayed there standing about only two or three minutes, and then we went back down to the barn. Our object in going back to the barn was Mr. Martin said, 'He's down there, I can find him.' I said, 'I will tell you sheriff, it's a little dangerous proposition to go down there, he can see us and we can not see him.' I think it advisable to go up to the house and wait until he comes up. We went back to the barn. We went back and Mr. Martin struck a match and looked in where the horse was in the stable and said, 'This is Phil's horse all right.' I was standing right by him when Mr. Martin opened the door and struck the match and said 'This is Phil's horse all right.' When we got down to the next stall Mr. Martin walked up to the door a little east of the center of the door; as we walked up, Mr. Martin said, 'Have you a match?' I said, 'Yes, here's one,' and I run my finger in my pocket, and the gun was fired. The place where Mr. Martin struck the match was some sixteen or

eighteen feet from the stall where the gun was fired. . . . Immediately after the shot was fired, Mr. Martin said, 'Phil, you have killed me,' kept repeating, 'Phil, you have killed me.' He must have said it half a dozen times, 'Phil, you have killed me.' . . . When I made this trip over there at the time Mr. Martin was shot, it was for the purpose of putting him off. I went there to tell him that I had this replevy bond."

There was about fifteen or twenty minutes elapsing between the time that Martin shot at appellant as he was going to his barn and the firing of the shot which killed Martin. On cross-examination, this witness said that he had no process to serve on appellant when he went to his house that night, and neither did Sheriff Martin, who was killed. He said he went there only to talk to him. That he did not have any process of any kind to serve on him. When Mr. Martin fired the shot, Bolton says he was about ten steps ahead of him. He stopped and said, "I wouldn't do that, sheriff. I said that loud enough for him to hear me. He did not say anything. I said I wouldn't do that. I said that because I didn't see any use in it. That was the only reason. I didn't feel I had a right to fire that gun and didn't feel that Mr. Martin had a right. I had no kind of process, either civil or criminal, to serve on him." Neither Martin nor Bolton undertook to serve any process on appellant. Bolton had none. Martin was a State officer, not a Federal officer. Both were trespassers. The sequestration bonds he had, which had been given by plaintiff against appellant in Federal Court were not "process."

There was no conversation between Bolton and Martin had with appellant. Appellant, under this record, did not say anything to the parties while they were there. This witness further testified that they walked towards the barn after he told Martin he had rather wait at the house. "I said awhile ago, Martin said Phil is down there, we can find him, and we went down to hunt him down. We did go down to hunt him down. We got through the fence and went to hunt him down. We went to hunt him down. I further testified on habeas corpus trial Mr. Fifer did not make any demonstration until we cornered him and he had no avenue of escape. He made no effort until we had hunted him down to fire any shot. At the time Martin fired this shot, Fifer did not have any weapon in his hand as he ran from the house to the barn. If he had a gun with him I would have seen it. I did not see any. He was not making any demonstration towards Martin."

This is a sufficient statement of the State's side of the case to bring in review the law questions that I desire to discuss. Appellant took the stand and gave his version of the matter. He says: "It was not my intention to use any violence against anyone unless attacked. There was nothing only good feeling existing between me and Mr. Martin prior to January 26, 1911." This was the night of the homicide. Appellant had been duck hunting that evening, and returning, left his

gun in a manger in one of the stalls at his barn, which is about 175 yards from his residence. He further testified that at the time he blew out the light and started from his house to his barn, it was for the purpose of feeding his stock, and he was wholly unaware of the presence of Bolton and Martin until after he emerged from his house. He says, "After I got out the door and went five or six steps, I glanced around and saw a party in the dark. I went on ten steps further and some one spoke to me and said, say, hold on. I didn't stop and they said, 'Say, Phil, hold on;' I didn't stop, I just kept going down toward the corral. I could not tell who it was. I went to the corral a little south of east. There was no gate for them to come through my fence at that part of the fence. Straight from the house to the fence I suppose it was about 100 yards. The way I went from the house down to my barn, sheds and corral I suppose it was 175 yards. After I got to the southwest corner of the corral, there was a fence that continues on south, the southwest corner of the stock yard there is a fence that extends on down and joins another fence; when I got to that fence someone hollered stop. I did not know who it was that hollered stop. After I got over the fence I went possibly two or three steps and there was a shot fired at me. I heard the ball, it came close enough for me to hear the ball. There was two shots fired at me and I run. They were just as close together as a man could shoot two shots, I reckon. I couldn't say where they got over the fence; the best I could tell from the location they were on the inside of the fence when I saw them; that was when they said, 'Say, hold on;' they were not north of the house, but a little east of north at the time the shot was fired." They followed him to the barn, and when reaching the corral, they opened the gate and went to the stable door. "I did not hear either of them say anything at that time. When they got to the door, I could hear the match struck, hear it pop, and I heard one say that is his horse. I did not know from their voice who it was; he spoke in a low tone of voice, and I could not recognize who it was. There was a gate at the southwest corner of the corral, and I heard the gate fly open, swing back and hit the fence, and I could hear them walk out into the stock yard; they were gone possibly two or three minutes; they came back to the corral and came back into the open shed at the east end of the crib where I was. They did not at any time make known to me who they were, nothing at any time; there were no words spoken, or no names called, or make known their business. I next saw them after they came back to the east end of the crib. I heard someone walk up by the side of the crib and the door was darkened, and it was then that I fired the gun. When the door was darkened I fired the gun. I did not know who it was when I fired the gun. What caused me to find out who it was, I heard someone say, 'You have killed Mr. Martin,' that is the first I knew who it was. When I fired this shot when this door was darkened, there had not been any explanation made to me of the shots that had been fired at me. I will tell the jury that I fired

this shot because I had not got over the excitement of when these shots were fired at me. I heard a man ask, 'Have you a match?' and I supposed they were there to hunt me down, and that when they struck the match, they would see me and I shot to protect myself from being shot. If these parties had not followed me up I would not have shot them. I am sorry it was done, it occurred; if they had come there in the day time it never would have occurred. I did not have any such feeling toward Mr. Martin that I wanted to injure him in any way. If Mr. Martin had not followed me up down there as they did and fired these shots I would not have shot when the door was darkened. I shot one time."

While the testimony is voluminous, this is a sufficient statement to show the two theories upon which the case was tried. The court charged appellant's right of self-defense as against danger or appearance of danger from the deceased, Martin, and confined the jury, in passing upon the question of self-defense, exclusively to the self-defense theory on account of the danger from Martin. Just why this limitation was placed on the doctrine of self-defense is not explained in the record, nor has it been explained in the opinion of my brethren. The only theory upon which this judgment can be affirmed is that the trial court did not believe appellant's testimony, and discarded even that of the State witness, Bolton, and the majority of this court has followed the same line of thought. If the testimony of appellant is discarded from this record, the theory of self-defense is brought prominently from the testimony of Bolton, both as against Martin and himself, and required of the court to charge the jury the theory of self-defense as against both Martin and Bolton. Bolton testified they went there at night. When appellant left his residence, going in direction of his barn, he was running. He certainly had a right to run. Bolton says Martin fired one shot at appellant. There was absolutely no excuse or reason for the conduct of the two parties at appellant's house that night, and there certainly could be no excuse for the shot that was fired at appellant when he was running to get away from him. He was at home where he had a right to be. They were trespassers under Bolton's testimony. Bolton says they had no process to serve on him, went to the barn to hunt him down, and they did hunt him down, and if they had not hunted him down, this killing would not have occurred. This is plainly evident from Bolton's testimony. When we supplement Bolton's testimony with that of appellant, he says he was running, and they fired two shots at him. He went to his barn where he had a right to go. They followed him into his barn, hunting him down, as Bolton said, where they had no right to go and doing an unlawful act which was not justified, but condemned by the law. If they had process to serve, they were acting in an unlawful, unauthorized and illegal way. 34 Texas Crim. Rep., 161; 32 Texas Crim. Rep., 319. From either standpoint, the State's or the defendant's testimony, appellant had a right to defend against both, and his legal rights under all the

authorities and under our statutes were overridden in the trial court and is affirmed here. The authorities are overwhelming in Texas, and without exception, and so far as I am aware, absolutely everywhere, without an exception, that a party has the same legal right to defend against more than one aggressor as he has against the ·attack of one assailant. This case forms the exception and overrides and sets at naught the law as it has been declared in all the history of our jurisprudence. Perhaps, the correctness of this question might be illustrated from another standpoint. Reverse the homicide and make Martin the slayer and appellant the victim. Place Bolton upon trial before a jury: would any lawyer question for one moment that the court would be required to charge the jury the law of principals, and that had Martin killed Fifer, and Bolton was present, knowing his unlawful intent, aided or encouraged by words or gestures, or was acting with Martin, he would be as guilty as Martin? Were Bolton and Martin acting together? What does Bolton say about it? Is there a candid mind who doubts they were acting together after reading Bolton's evidence? Bolton was a Federal officer only to serve process for the Federal Court. Martin was a State officer, without authority to serve Federal process, but went with Bolton. Bolton's evidence demonstrates, as does all the facts, that Bolton and Martin got together for a common purpose. They went together to appellant's house to put him off the premises. Bolton had no process for that purpose. They went at night. They were hunting appellant; ·went for that agreed purpose. They together chased him from his house to his barn; together they were searching the barn, one furnishing matches while the other lighted them in order to find appellant. They left town for the purpose, agreed purpose, of going to the home of appellant. Everything they did thenceforward was by a common design, acting to a common end, each aiding the other to accomplish that common purpose. Yet in the face of all these facts produced by the State witness, Bolton, it is to be written into the jurisprudence of this State that appellant could only defend against one of the assailants; that he had no legal right to defend against Bolton; that Bolton's conduct was too trivial to form the basis of a charge on self-defense, yet he was acting purposely with Martin. The reason for this distinction I have sought in vain. My brethren do not give me any light. I will cite a few of the cases in regard to sustaining the proposition that a party has the same right to defend against two or more as he would against one assailant. Bean v. State, 25 Texas Crim. App., 357; Francis v. State, 55 S. W. Rep., 488; Stacy v. State, 48 Texas Crim. Rep., 96; Meuly v. State, 25 Texas Crim. App., 302; Barnard v. State, 25 Texas Crim. App., 174; McLaughlin v. State, 10 Texas Crim. App., 359; Cartwright v. State, 16 Texas Crim. App., 487; Jones v. State, 20 Texas Crim. App., 670; Seeley v. State, 43 Texas Crim. Rep., 69. Again, suppose appellant had killed Bolton instead of Martin, will it be maintained that he was

not entitled to a charge on self-defense? Certainly he would. Under the opinion, however, he would not be.

The authorities are entirely harmonious, and without a dissent, that where the evidence raises the issue of self-defense, failure to charge on that theory is reversible error, and this includes every theory of self-defense made by the evidence. It is not sufficient to submit only a part of the law of self-defense, but whatever of self-defense is raised by the testimony, the law demands of the trial court that he submit the law fairly and fully as to all such evidence. The court can not be justified in selecting a part of the testimony on this subject and only submit the issue of self-defense from his selection. All phases of self-defense are equally guaranteed by the law. Right of self-defense is not to be held at caprice, but is legally a sacred right. It is not to be treated as "hypercritical" as held by my brethren. The authorities upon this proposition are absolutely so numerous, harmonious and overwhelming, and so well known to the profession that I deem it unnecessary to cite them. This is as much as I care to say upon this branch of the case.

I desire also to say under the evidence stated, the issue of manslaughter was clearly and definitely raised. Here were two men visiting appellant's house at night. He says he did not know who they were. Bolton says Martin informed him that it was he, Martin, but Martin did not inform appellant who was with him. Not only so, but when they hailed appellant, appellant ran, and under Bolton's testimony, Martin fired at him once. Under appellant's testimony, he fired twice, and one of the balls passed near enough to his head for him to hear it. They pursued him as he ran from them; he ran into his own barn; they pursued him there, and as Bolton says, "hunted him down." Martin did not have any pistol in his hand at the time the fatal shot was fired, but under Bolton's testimony, it had not been more than fifteen or twenty minutes from the time Martin had fired at appellant fleeing until the fatal shot was fired, and all this occurred in the dark hours of the night on appellant's premises, and by those who could not and did not justify their presence and conduct at the time and place. If this does not suggest the issue of manslaughter, it would be difficult for a state of facts to arise which would suggest that theory. Not only so, but manslaughter was further in the case from the standpoint of cooling time. Appellant did all in his power to have this phase of the law charged as well as he did with reference to self-defense. He promptly took exceptions to the failure of the court to give the charges, and urged these in every possible legal way, besides requesting special charges. It occurs to me that if there ever was a case before this court in its history, that demanded charges upon self-defense against two parties, this is a case, and it is as equally certain to my mind, under the facts, that if the issue of manslaughter could possibly be raised, it was raised under the facts of this case.

I desire, respectfully, but most earnestly, to dissent.